**UNITED STATES, Appellee**

v.

**Ronnie A. CURTIS, Lance Corporal U.S. Marine Corps, Appellant.**

No. 94–7001.
CMR No. 87–3856.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 13, 1994.

Decided June 21, 1996.

For Appellant: *Commander M.T. Hall*, JAGC, USN, and *Lieutenant W.M. Schrier*, JAGC, USNR (argued); *Lieutenant D.P. Sheldon*, JAGC, USNR (on brief).

For Appellee: *Commander Stephen A. Stallings*, JAGC, USN (argued); *Colonel T.G. Hess*, USMC, *Lieutenant Brian B. Rippel*, JAGC, USNR, and *Captain A. Diaz*, USMC (on brief).

*Amicus Curiae urging reversal*

*Colonel Jay L. Cohen* and *Captain Del Grissom* (on brief)—For Appellate Defense Division, U.S. Air Force.

*Colonel Stephen D. Smith, Lieutenant Colonel John T. Rucker, Major Fran W. Walterhouse, Major Roy L. Hewitt, Captain Richard E. Burns, Captain Teresa L. Norris* (on brief)—For Defense Appellate Division, U.S. Army.

TABLE OF CONTENTS

PAGE

APPELLATE HISTORY ................................................... 116
FACTUAL BACKGROUND ................................................ 116
LEGAL ISSUES
 I. EFFECTIVENESS OF COUNSEL ................................... 118
 A. Procedural Disposition ........................................ 118
 B. Application of *Strickland* ...................................... 118
 1. Background .............................................. 120
 2. Intoxication .............................................. 122
 3. Sentencing Argument ..................................... 123
 4. Inexperience of Counsel ................................... 124
 5. Change of Venue .......................................... 124
 6. *Voir Dire* ................................................ 124
 7. Failure to Object to Misstatements During *Voir Dire* .............. 125
 C. Conclusion .................................................. 125
 II. FAILURE OF COURT OF MILITARY REVIEW (CMR) TO
 ADDRESS EACH ISSUE ........................................ 126
 III. CMR FAILURE TO COMPLY WITH REMAND DIRECTIONS .......... 126
 IV. APPLICABILITY OF ABA GUIDELINES TO MILITARY
 COUNSEL IN CAPITAL CASE ................................... 126

114

PAGE
 V. LACK OF INDEPENDENT DEFENSE COMMAND....................127
 VI. LARCENY CHARGE—FAILURE TO STATE OFFENSE ...............128
 VII. MULTIPLICITY.......................................................128
 VIII. REFERRING BOTH SERIOUS AND MINOR OFFENSES TO
 SAME COURT .........................................................128
 IX. FAILURE OF DEFENSE COUNSEL TO ADVISE APPELLANT
 OF LACK OF DEATH PENALTY CASE EXPERIENCE ..............129
 X. ADVICE BY MILITARY JUDGE (MJ) TO APPELLANT
 CONCERNING QUALIFICATIONS OF HIS COUNSEL ..............129
 XI. FAILURE OF MJ TO INQUIRE AS TO TRAINING, EXPERI-
 ENCE, AND EDUCATION OF DETAILED COUNSEL TO
 DEFEND CAPITAL CASES ........................................129
 XII. VALIDITY OF REQUIRING TRIAL WITH MEMBERS................129
 XIII. RIGHT TO INDICTMENT BY GRAND JURY .........................130
 XIV. PROPRIETY OF EXCLUDING ENLISTED MEMBERS IN
 APPELLANT'S UNIT FROM MEMBERS POOL .................130, 132
 XV. PRETRIAL PUBLICITY AND RACIAL DISCRIMINATION ............133
 XVI. APPLICABILITY OF ARTICLE III RIGHT TO TRIAL BY JURY....130, 131
 XVII. CONVENING AUTHORITY'S UNDERSTANDING THAT HE
 COULD DETAIL ALL ENLISTED MEMBER COURT OR
 USE RANDOM SELECTION ....................................130, 132
 XVIII. VALIDITY OF SELECTION PROCESS OF MEMBERS
 HANDPICKED BY CONVENING AUTHORITY.................130, 132
 XIX. RIGHT TO TRIAL BY JURY FROM CROSS–SECTION OF
 COMMUNITY IN COURTS–MARTIAL ........................130, 131
 XX. INTENTIONALLY EXCLUDING WOMEN FROM PANEL .........130, 132
 XXI. GOVERNMENT MAKING *WITHERSPOON* CHALLENGE .....130, 132, 133
 XXII. POWER OF PRESIDENT TO GIVE PROSECUTOR A PEREMP-
 TORY CHALLENGE .........................................130, 132
 XXIII. USE OF PREEMPTORY CHALLENGE BASED ON MORAL
 BIAS AGAINST DEATH PENALTY WHICH DOES NOT
 JUSTIFY CHALLENGE FOR CAUSE...........................130, 132
 XXIV. ADMISSION OF WEDDING PHOTOGRAPH...........................140
 XXV. ADMISSION OF THREE PHOTOGRAPHS OF FEMALE
 VICTIM AFTER HOMICIDE .......................................140
 XXVI. DENIAL OF RIGHT TO PLEAD GUILTY IN CAPITAL CASES.......141
 XXVII. WARRANTLESS SEARCH AND SEIZURE OF APPELLANT'S
 CLOTHING AT CIVILIAN CONFINEMENT FACILITY..............141
 XXVIII. ADMISSIBILITY OF CONFESSIONS UNDER *MIRANDA* AND
 ARTICLE 31(b) ......................................................143
 XXIX. APPELLANT'S CONFESSIONS AS TAINTED BY PRIOR
 INADMISSIBLE STATEMENTS ....................................143
 XXX. SUFFICIENCY OF EVIDENCE TO ESTABLISH INDECENT
 SEXUAL ASSAULT ................................................145
 XXXI. SUFFICIENCY OF EVIDENCE THAT JOAN LOTZ WAS
 KILLED WITH PREMEDITATION .................................146
 XXXII. REASONABLE–DOUBT INSTRUCTION .............................149
 XXXIII. ALLEGATION CONCERNING BIKE'S VALUE.......................149
 XXXIV. CMR FAILURE TO CONSIDER DIMINISHED *MENS REA* ...........149
 XXXV. DESIGNATING SENIOR MEMBER AS PRESIDENT OF
 PANEL.............................................................149
 XXXVI. FAILURE TO INCLUDE CAPITAL SENTENCING MECHA-
 NISM IN PRELIMINARY INSTRUCTIONS .......................150
 XXXVII. FAILURE TO RECORD RCM 802 SESSION .........................150
 XXXVIII. MANSLAUGHTER INSTRUCTION ..................................151
 XXXIX. FAILURE TO INSTRUCT *SUA SPONTE* ON VOLUNTARY
 MANSLAUGHTER AS TO JOAN LOTZ ...........................151
 XL. INSTRUCTION ON BURGLARY ...................................151
 XLI. FAILURE TO PROVIDE *SUA SPONTE* INSTRUCTION ON
 VOLUNTARY INTOXICATION ....................................152

XLII. INSTRUCTION ON MALICE AND *MENS REA* CONCERNING PREMEDITATION .................................152
XLIII. INSTRUCTIONS REQUIRING MEMBERS TO VOTE ON SERIOUS OFFENSE FIRST .................................152
XLIV. FAILURE TO INSTRUCT ON SELF–DEFENSE REGARDING KILLING MRS. LOTZ .................................153
XLV. FAILURE OF MJ *SUA SPONTE* TO INQUIRE WHEN APPELLANT TESTIFIED HE DECIDED TO KILL LIEUTENANT LOTZ .................................156
XLVI. FAILURE TO GIVE INSTRUCTION ON GENERAL MITIGATING FACTORS AND ON INTOXICATION AS MITIGATING FACTOR .................................156
XLVII. INSTRUCTION ON BURDEN OF PROOF AS TO MITIGATING FACTORS .................................156
XLVIII. PROPRIETY OF PROSECUTOR'S ARGUMENTS ON FINDINGS AND SENTENCE .................................156
XLIX. MANDATORY MINIMUM LIFE SENTENCE .................................157
L. BURGLARY AS BASIS FOR FELONY MURDER .................................157
LI. BURGLARY AS DEATH QUALIFIED OFFENSE—ABSENCE OF PROOF OF BREAKING .................................158
LII. STANDARD FOR WEIGHING AGGRAVATING FACTORS AGAINST EXTENUATING AND MITIGATING CIRCUMSTANCES .................................159
LIII. FAILURE TO GIVE SENTENCING INSTRUCTION ON MEANING OF "SUBSTANTIALLY OUTWEIGH" .................................159
LIV. FAILURE OF FINDINGS TO EXPLICITLY STATE EXTENUATING AND MITIGATING CIRCUMSTANCES SUBSTANTIALLY OUTWEIGHED BY AGGRAVATING FACTORS .................................159
LV. SUFFICIENCY OF INSTRUCTIONS TO INFORM MEMBERS THAT FINDINGS REGARDING WEIGHING MUST BE UNANIMOUS .................................159
LVI. FAILURE TO INSTRUCT MEMBERS THAT THEY COULD STILL DECLINE TO IMPOSE A DEATH SENTENCE EVEN IF THEY FOUND AGGRAVATING FACTORS OUTWEIGHED MITIGATING AND EXTENUATING CIRCUMSTANCES .................................160
LVII. FAILURE TO ADVISE MEMBERS THAT A SINGLE VOTE COULD REJECT A DEATH SENTENCE .................................160
LVIII. PROPRIETY OF DOUBLE COUNTING OF AGGRAVATING FACTORS .................................160
LIX. PROPRIETY OF CHARGING PREMEDITATED MURDER RATHER THAN FELONY MURDER TO ALLOW USE OF BURGLARY AS AN AGGRAVATING FACTOR .................................160
LX. SUFFICIENCY OF PREJUDICE ANALYSIS BY CMR TO CURE ERROR OF DOUBLE COUNTING .................................161
LXI. APPLICATION OF HARMLESS–ERROR TEST WHEN MEMBERS ERRONEOUSLY IMPOSED SENTENCE BASED ON THREE RATHER THAN TWO AGGRAVATING FACTORS .................................161
LXII. TIMELINESS OF NOTICE OF AGGRAVATING FACTORS .................................161
LXIII. NEED FOR NOTICE OF AGGRAVATING FACTOR WHEN PROSECUTION ARGUED THAT LIEUTENANT LOTZ WAS IN THE EXECUTION OF HIS OFFICE WHEN KILLED .................................162
LXIV. TIMELINESS OF NOTICE OF AGGRAVATING FACTORS .................................162
LXV. REQUIREMENT FOR DEFENSE COUNSEL TO JUSTIFY DECISION NOT TO INTRODUCE SIGNIFICANT MITIGATING FACTORS AND TO SHOW DECISION WAS WITH EXPRESS CONSENT OF CLIENT .................................163
LXVI. SUFFICIENCY OF SENTENCING PROCEDURES TO ALLOW RATIONAL UNDERSTANDING OF STANDARDS USED IN IMPOSING DEATH SENTENCE .................................163

PAGE

LXVII. SUFFICIENCY OF TREATMENT IN STAFF JUDGE ADVO-
 CATE (SJA)'S RECOMMENDATION OF ACCUSED'S SUI-
 CIDAL STATE, RACIAL HARASSMENT, INTOXICATION,
 AND EXEMPLARY LAW–ABIDING LIFE .......................... 163
LXVIII. LACK OF LIFE TENURE FOR JUDGES OF THIS COURT............ 164
LXIX. JUDGE ADVOCATE'S GENERAL'S PREPARATION OF
 APPELLATE JUDGES' FITNESS REPORTS ....................... 164
LXX. CMR'S DUTY TO ENSURE QUALIFIED COUNSEL FOR
 APPEAL OF CAPITAL CASE .................................... 164
LXXI. REQUIREMENT THAT CMR APPLY IN FAVOREM VITAE
 POLICY AND UNANIMOUSLY AGREE TO AFFIRM FIND-
 INGS AND SENTENCE IN CAPITAL CASE ...................... 164
LXXII. CUMULATIVE ERROR AS HARMLESS BEYOND A REASON-
 ABLE DOUBT ...: ........................................... 165
LXXIII. PROPORTIONALITY REVIEW BY INTERMEDIATE
 APPELLATE COURT.......................................... 165
LXXIV. FAILURE TO ALLOW APPELLANT TO HIRE INDEPEN-
 DENT PROPORTIONALITY CONSULTANT ....................... 165
LXXV. VALIDITY OF CMR CONCLUSION APPELLANT'S
 SENTENCE WAS NOT DISPROPORTIONATE ..................... 165
LXXVI. CMR'S CONCLUSION THAT APPELLANT'S DEATH
 SENTENCE WAS APPROPRIATE ................................ 165
CONCLUSION ..................................................... 166

---

*Opinion of the Court*

CRAWFORD, Judge:

In the summer of 1987, appellant was convicted at Camp Lejeune, North Carolina, contrary to his pleas, of premeditated murder[1] (2 specifications), larceny (3 specifications), wrongful appropriation, burglary, housebreaking (2 specifications), indecent assault, and willfully damaging government property, in violation of Articles 118, 121, 129, 130, 134, and 108, Uniform Code of Military Justice, 10 USC §§ 918, 921, 929, 930, 934, and, 908, respectively. Consistent with his pleas,[2] he was convicted of violating a lawful general order, in violation of Article 92, UCMJ, 10 USC § 892. He was sentenced to death by the members, and the convening authority approved this sentence.

There have been two reviews by the Court of Military Review.[3] 28 MJ 1074 (1989), and 38 MJ 530 (1993). This marks the third time appellant's case has been before this Court. 33 MJ 101 (CMA 1991), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1177, 117 L.Ed.2d 421 (1992); and 32 MJ 252 (CMA), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991).

On the first review prior to our decision on the merits, this Court upheld the constitutionality of the capital punishment procedures in the military. 32 MJ 252. On the second review, this Court addressed the following issues relating to: *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); sentencing instructions; computation of aggravating factors; proportionality review; as well as miscellaneous issues. 33 MJ 101. The case was then remanded to the court below for review of the last three items.

For the reasons contained in this opinion, we affirm the decision of the United States Navy–Marine Corps Court of Military Review.

Factual Background

At the time of the murders appellant was a 21–year–old black male, 6 feet 4 inches tall, weighing 185 pounds, assigned to the 3d

---

1. The members did not return a finding as to Charge I (R.747), but that is nonprejudicial. *See United States v. Dilday,* 47 CMR 172, 174 (ACMR 1973).

2. This did not violate *United States v. Dock,* 28 MJ 117, 118–19 (CMA 1989).

3. *See* 41 MJ 213, 229 n. * (1994).

Battalion, 2d Marine Regiment, 2d Marine Division, Camp Lejeune, N.C., as a supply clerk. His officer-in-charge was the Battalion Supply Officer, First Lieutenant (LT) James Lotz. Since 1985 appellant and LT Lotz had had a fair amount of contact, with the exception of their brief tour in Okinawa where the two rarely saw each other.

On April 13, 1987, around 1930 hours, appellant and his roommate, Lance Corporal (LCPL) Moore, sat in their room in the barracks of Camp Lejeune sharing a hoagie and a half-gallon of gin, using Mountain Dew as a mixer. Appellant drank as much as a pint of gin. At approximately 2300 hours Moore left. About 15 minutes later, appellant went to the recreation room for a few minutes. He then walked to the Supply Building, broke into the warehouse by breaking out two windows, and gained entry to the building. By jimmying the lock of the security cage inside, appellant entered the area of the warehouse where secured or controlled-type items were stored. Appellant testified that at this time he needed to get in, get a knife, and go to LT Lotz' quarters. He stole a knife with an 8-inch blade and leather handle. While in the warehouse, he also damaged a computer. Appellant went back to his room, picked up a canteen which he filled with gin and Mountain Dew (but did not drink any more), and retrieved a pair of his gloves so there would be no fingerprints later. Thereafter, he took a 10-speed bicycle and then rode the bicycle approximately 1 1/2 miles to the victims' quarters where appellant had been at least two times before.

By this time it was approximately midnight. Appellant concealed the bike around the back of the Lotz' house and looked in the back window and saw Lotz on the couch in the living room. Then he went around front and knocked on the door. When LT Lotz answered the door, appellant told him one of his friends needed help because he had been in an accident. Lotz "invited" him into the house. When LT Lotz tried to telephone for help, appellant "plunged" the knife into Lotz' chest. Although at this time Lotz was still alive, this wound turned out to be the fatal

injury because it punctured the victim's heart. LT Lotz struggled and picked up a chair to defend himself. Appellant then went around the chair and stabbed Lotz a second time. During this struggle, LT Lotz called for his wife, Joan. She appeared on the scene, ran up to her husband, and then turned to appellant and called out his name. She started kicking him, albeit with her bare feet. Then appellant stabbed her eight times, the fatal wound being a heart puncture. Appellant grabbed Joan by the legs as she was dying, pulled her toward him, "ripped off her panties," and fondled her genitalia.

He then "went through the house." He believed that if anyone else was there alive, he "would have killed them" too, if they were not sleeping. Appellant rummaged through the house looking for some "big money" to buy gasoline and looked in the refrigerator for something to eat. He took $5 for gas money and two sets of car keys, stole the victims' Renault, drove it around for awhile, but then returned to the house because he could not get the car into reverse. Appellant went back into the house. He testified that he then felt he had to kill himself or run away. He started looking for a gun to kill himself. He ransacked the house in order to steal more money; checked to see if the victims were dead; looked around for food again; went outside and got sick; and then left with the victims' Ford Tempo. He drove around base for about an hour or two, trying to figure out what to do; finally, he stopped at the Officer of the Day (O.D.) shack and attempted to obtain the staff duty officer's gun by trickery. Unsuccessful, he got back into the car and drove around; then he stopped at another O.D. shack but left shortly afterwards because he was being given a "hard time" by a white sergeant. Appellant then proceeded out of the Main Gate of Camp Lejeune and headed toward Wilmington, N.C.. En route, he had a car accident because he fell asleep at the wheel.

North Carolina State Trooper Danny Addison was called to the wreck. The trooper talked to appellant, at which time appellant

admitted to having drunk alcohol the night before and then stated that he had killed someone. The trooper placed appellant under apprehension and took him in for questioning; later appellant was turned over to the military. Appellant spoke to the Naval Investigative Service (NIS) for about 10–12 hours, during which time he signed a full confession describing most of the details related in the above statement of facts. The confession also indicates that appellant believed LT Lotz to be a racist and goes into details as to why appellant held this belief.

■ The offenses were service connected because they occurred on base and the victims were appellant's commander and his wife. See *Loving v. United States,* —— U.S. ——, ——, 116 S.Ct. 1737, ——, 135 L.Ed.2d 36 (1996) (Stevens, J., concurring); *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

## LEGAL ISSUES

### ISSUE I

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED IN HOLDING THAT APPELLANT WAS NOT DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

The defense argues that trial defense counsel was ineffective for (1) failure to conduct an adequate background investigation of appellant, including employing a mitigation expert; (2) failure to develop and emphasize evidence of appellant's intoxication; (3) failure to present an adequate sentencing argument; (4) failure to have adequate training and experience in handling capital cases; (5) failure to move for a change of venue; (6) failure to conduct adequate *voir dire;* and (7) failure to object to misstatements by trial counsel during *voir dire.*

### (A) Procedural Disposition.

The defense at a minimum requests further proceedings pursuant to *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967), to examine these issues. Such a procedural disposition is a misapplication of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It overlooks the presumption of competence and engages in "Monday morning quarterbacking" of counsel's strategic and tactical decisions. It is time for this Court finally to decide this case based upon the record that is before us. Indeed, the weight of Supreme Court authority compels us to do so.

■ A *DuBay* hearing should not be held when the files and records in the case establish that there was effective assistance of counsel. See, e.g., *United States v. McGill,* 11 F.3d 223 (1st Cir.1993); *Ebbole v. United States,* 8 F.3d 530 (7th Cir.1993), *cert. denied,* 510 U.S. 1182, 114 S.Ct. 1229, 127 L.Ed.2d 573 (1994). Before a *DuBay* hearing is to be ordered, the facts on the record must be unclear and the party seeking relief must demonstrate that such a hearing is likely to be effective. *See United States v. Tharpe,* 38 MJ 8 (CMA 1993); *see also United States v. Loving,* 41 MJ 213, 241–45, 246–49 (1994), *aff'd on other grounds,* —— U.S. ——, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). Neither of those requirements are satisfied in this particular case. This record contains an adequate factual basis for our determination of both prongs of the *Strickland* standard.

### (B) Application of Strickland.

In *Strickland,* a capital case, there was an allegation that the defendant's attorney had been ineffective in the failure to investigate and introduce mitigating evidence at the penalty stage. *Strickland's* defense counsel did not investigate the possibility of pre-sentencing psychiatric or character evidence for the sentencing stage because "his conversations with his client gave no indication that [defendant] had psychological problems." Moreover, defense counsel did not seek a further background investigation because he believed such an investigation might reveal harmful information that could have an adverse im-

pact during sentencing. 466 U.S. at 673, 104 S.Ct. at 2057.

The Court applied a two-pronged test. The first prong is whether counsel's conduct "fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2064; second, if so, whether there was prejudice, *id.* at 692, 104 S.Ct. at 2067. The Court did not impose more rigorous standards on the conduct of criminal defense counsel in death penalty cases than it did in other cases. "For purposes of describing counsel's duties . . . [a] capital sentencing proceeding need not be distinguished from an ordinary trial." *Id.* at 687, 104 S.Ct. at 2064. The *Strickland* Court did not refer to any special requirements in capital cases.

■ As recognized in *United States v. Loving,* 41 MJ at 248, this Court has adopted the further clarification of *Strickland* by *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993), as follows:

> Under our decisions, a criminal defendant alleging prejudice must show "that counsel's errors were so·serious as to deprive the defendant of a fair trial, a trial whose result is reliable." . . . Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Fretwell* was also a capital case involving an issue of double counting.

■ The *Strickland* Court emphasized that "[j]udicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689, 104 S.Ct. at 2065. "[C]ounsel is strongly presumed" to have given "adequate assistance." *Id.* at 690, 104 S.Ct. at 2066. The Court warned: "It is all too tempting . . . to second-guess" a lawyer's performance, and the court should try to "eliminate the distorting effects of hindsight." *Id.* at 689,

104 S.Ct. at 2065. Acts or omissions by counsel that are strategic or tactical do not lead to a violation of the first prong of the test. The Court in *Strickland* held that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. at 2066.

Justice O'Connor, in writing for the majority, concluded that counsel was reasonable because, given the overwhelming aggravating factors, such additional evidence "would be of little help" and counsel's decision not to present the evidence had the advantage of "ensur[ing] that contrary character and psychological evidence and [defendant's] criminal history . . . would not come in." *Id.* at 699, 104 S.Ct. at 2071. The Court opined that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. at 2066.

■ There is no question that capital trials differ at many stages from non-capital cases as to jury selection—*see, e.g., Morgan v. Illinois,* 504 U.S. 719, 727–31, 112 S.Ct. 2222, 2229–30, 119 L.Ed.2d 492 (1992); closing arguments—*see, e.g., Caldwell v. Mississippi,* 472 U.S. 320, 325, 332–33, 105 S.Ct. 2633, 2641–42, 86 L.Ed.2d 231 (1985); jury instructions—*see, e.g., Beck v. Alabama,* 447 U.S. 625, 642–43, 100 S.Ct. 2382, 2392, 65 L.Ed.2d 392 (1980); and what this Court has required as to proportionality review—*United States v. Murphy,* 36 MJ 8 (CMA 1992), *but see id.* at 9–11 (Crawford, J., dissenting). Many argue that capital trials differ from normal trials because only in the former is an adversary sentencing proceeding required. One should recognize that in the military justice system, there is always a bifurcated procedure, whether the trial is by judge alone or by members, in which there is a separate sentencing hearing. Mitigating evidence may, however, be introduced at both the findings and the sentencing stages of a capital trial.

In capital trials counsel must decide how to defend with regard to where unanimous votes are required. Overarching the deficiencies alleged by appellate defense counsel is what we recognized in *United States v. Tharpe*, 38 MJ at 16: "The fact that appellate defense counsel have now conceived a different trial tactic from the one used at trial does not mean that the lawyer at trial was ineffective." The defense must adopt "a coherent theme" and strategy which is important for the findings as well as the sentencing portion of the proceedings. *United States v. Woolheater*, 40 MJ 170, 173 (CMA 1994).

Because this case involves a bifurcated proceeding, it is more difficult to develop a viable strategy for both stages. This factor is further complicated because a military defendant may not plead guilty to a capital offense. Art. 45(b), UCMJ, 10 USC § 845(b). Trial defense counsel "did not view" the two phases of the trial as separate; instead he developed a theory that would be consistent throughout the trial. Counsel was also aware that defense evidence may be a double-edged sword, *i.e.*, what is potentially helpful in one stage may be damaging at another stage of the proceeding. Thus, counsel had to be careful not to be inconsistent and raise issues that would be more aggravating when considered by the court members.

### (1) Background

The defense proposal for a *DuBay* hearing is predicated on the need to resolve the issue of effectiveness of two military defense counsel, Major James G. Boyett, lead counsel, and Captain Gary E. Lambert, assistant defense counsel, in part in connection with the depth and scope of trial defense counsels' investigation into appellant's background. We conclude that there is adequate information in the record and allied papers from which to determine the effectiveness of counsel on this as well as the other issues raised by appellant.

■ Notwithstanding the efforts made by trial defense counsel and the background information supplied to them by appellant, appellant's family members and friends, and the psychiatric evaluation of appellant, appellate counsel now argue that his counsel at trial were ineffective for failing to uncover evidence of his alleged physical and emotional abuse as a child. They claim that this information would have presented "uncontroverted information" as to why he was so vulnerable to racial taunts. Counsel further argue that the employment of a mitigation expert to explain his troubled family background should have been utilized by his trial defense counsel.

"[A] military accused is guaranteed the effective assistance of counsel at the pretrial stage," including the investigative stage. *United States v. Fluellen*, 40 MJ 96, 98 (CMA 1994); *United States v. Scott*, 24 MJ 186 (CMA 1987). *See also Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The strategy of the defense both at trial and sentencing was to present appellant as a young man adopted at age 2 1/2 and raised in a good Christian home whose dignity and self-worth had been systematically destroyed by LT Lotz' racist treatment of him. The record before us reveals the efforts made by defense counsel to investigate appellant's family and psychological background used in developing their trial and sentencing strategy. Although initially defense counsel attempted to develop an insanity defense, they made a tactical decision not to pursue a sociological and psychological defense because of appellant's earlier psychiatric evaluation by their expert. Defense counsel attempted to learn more about appellant's natural and foster parents from the Kansas State Department of Social and Rehabilitation Services. However, after receiving a response from the Kansas authorities, counsel concluded that they would not be able to locate appellant's natural parents. They made a tactical decision not to pursue this matter further since appellant had lived in his adoptive home since age 2 1/2. Additionally, based upon information provided to defense counsel by appellant, appellant's adoptive mother, aunt, and friend, counsel

had no reason to suspect that appellant's family background was any different from the "good Christian" defense presented in court.

Defense counsel also apparently contacted appellant's adoptive father and sister, and counsel did give some indication that they were aware of possible ill feelings between appellant and his adoptive father. Thus, following discussions with appellant, the defense did not call appellant's adoptive father as a witness. This appears to have been a tactical decision so as not to weaken the "good Christian" defense by any adverse testimony.

■ The information of record about the matter and method of background investigation appears to us to be sufficient to resolve any question of ineffectiveness of counsel concerning the depth and scope of the background investigation of appellant. As indicated in *Strickland,* counsel's duty to investigate depends critically on the information furnished by the defendant and his family. 466 U.S. at 691, 104 S.Ct. at 2066. *See also United States v. Powell,* 40 MJ 1 (CMA 1994) (counsel not ineffective in failing to investigate fabricated document to negate shoplifting offense); *cf. United States v. Smith,* 35 MJ 138 (CMA 1992). Here, defense counsel "spent a great deal of time talking to [appellant] and considering the best way to defend him." While there may be numerous alternative strategies, based upon the information available to them at the time, defense counsel sought to present appellant as a good, law-abiding person who was not violent rather than depicting him as maladjusted due to child abuse and alcoholism.

The presentation of a mitigation expert to explain what has now been alleged as background information is inconsistent with the defense theory as to the environment and family surroundings as presented by appellant and his family. *See White v. Singletary,* 972 F.2d 1218 (11th Cir.1992), *cert. denied,* —— U.S. ——, 115 S.Ct. 2008, 131 L.Ed.2d 1008 (1995), cited in *United States v. Loving,* 41 MJ at 250. While this tactic may

have been a reasonable alternative had appellant and his family been forthcoming with different background information for defense counsel, it is not without its pitfalls. Evidence of physical, mental, and psychological child abuse, as well as alcoholism might very well suggest that appellant could be a future danger to society because he would be unable to control his conduct based on his environment during his formative years. Instead, relying upon the information available to them, defense counsel decided to develop a racial-bias theory to appeal to the members on the panel and perhaps obtain one vote for the defense in the findings, aggravating factors, or sentencing portion of the court-martial. Certainly this strategy appears reasonable based upon the record before us.

In a similar case, defense counsel in *Burger v. Kemp,* 483 U.S. 776, 789–94, 107 S.Ct. 3114, 3123–26, 97 L.Ed.2d 638 (1987), recognized the effectiveness of presenting evidence of past abuse as potentially a double-edged sword. Burger's counsel "was aware of some, but not all, of this family history prior to [Burger's] trial." *Id.* at 790, 107 S.Ct. at 3124. But Burger's counsel did not introduce *any* evidence during *either* of two sentence hearings, let alone evidence that Burger came from an abusive family and was involved in juvenile delinquency. The Court accepted the defense counsel's explanation that to present that evidence would be "unproductive" and might very well have a negative impact during sentencing. *Id.* at 790 n. 8, 107 S.Ct. at 3124 n. 8.

Also, Burger's counsel was concerned with potential rebuttal evidence to certain background information. In appellant's case potential rebuttal of a social worker or psychologist would be appellant's lack of remorse at trial as shown by this statement to his escort during a recess: "I don't give a fuck about [the victim's] family." This evidence could be introduced to show that he was not remorseful and may impeach the witnesses who would testify concerning his background and impact the background had on his thinking processes. As the Court in *Burger* recognized, counsel was not ineffective in failing to

reveal defendant's family history and psychological problems. Burger's counsel believed that allowing a psychologist who examined the defendant to testify would result in damaging cross-examination.

As the Court of Military Review in its latest review of this case concluded:

> Even if all of the background information about the appellant had been known by the defense counsel, we would still not fault counsel's decision to follow the theory of defense presented in this case because it still would have been a reasonable strategy despite the alternative theory that might have been presented. In other words, it would not have been unreasonable for the defense to choose the discrimination theory over the abused child/psychological makeup theory, particularly where counsel believed a favorable panel of members had been detailed....

38 MJ at 539.

### (2) Intoxication

There is sufficient information in the record and allied papers on which to form an opinion as to trial defense counsel's effectiveness in dealing with the issue of intoxication. As we pointed out in *United States v. Woolheater*, 40 MJ at 173:

> In setting up a defense strategy for a case, counsel adopts a coherent theme and theory under which to present the case. The theme and theory usually take into consideration the strengths and weaknesses of the evidence that is both favorable and unfavorable to the accused....

■ Defense counsel had a number of options in dealing with the intoxication issue: to ignore it, deny it, or work it in to the findings and sentencing portions of the trial. According to Major Boyett, neither the sanity board nor the defense's own expert found alcohol to be a significant factor because of appellant's "ability ... to conceptualize." The court below agreed. 38 MJ at 537. Alcohol also did not affect his coordination or motor skills to any great degree (*i.e.*, appellant rode the bike 1 1/2 miles to LT Lotz'

home). Thus counsel made a strategic decision not to present intoxication as a key factor in the killings but, rather, to refer to it in argument.

Despite this tactical decision, there is evidence at trial that, although defense counsel did not dwell on alcohol as a factor, they did make sure that its existence entered the record. Trial defense counsel cross-examined Trooper Addison intensely regarding appellant's condition in relation to alcohol when the Trooper first found him. On direct examination counsel asked appellant whether and how much he had drunk that night. Appellant's response was "no more than a pint." During defense counsel's direct examination of LCPL Moore, counsel asked how much appellant had drunk that night. The response was about 3/4 or 1/2 of the half gallon of gin and that appellant was "drunk"—"heavily" drunk. Finally, during closing arguments on findings, defense counsel talked about intoxication in an effort to reduce premeditated murder to unpremeditated murder.

According to these facts in the record and in the allied papers, there is sufficient information to recognize that the use of an intoxication defense was not ruled out entirely. It seemed to have been merely downplayed as a tactical decision so that its use was not counterproductive to the real defense of the case which was racial bias. However, it was still available to the members should they wish to draw upon it as a mitigating factor in sentencing.

As stated earlier, the defense at trial had the results of the sanity board which indicated that "appellant did not lack mental responsibility for the charged offenses and" had "the capacity to stand trial." 38 MJ at 537. This is the information from which they reasonably and rationally decided not to pursue a voluntary intoxication defense as the primary defense. It is therefore inconsequential to our review of ineffectiveness that an *ex parte* post-trial background investigation revealed that appellant was physically, mentally, and sexually abused as a child and

had a "genetic predisposition to alcohol abuse." 38 MJ at 536. This information was unavailable to defense counsel at the time of trial, and pursuit of a more intensive background or mental investigation which may have revealed this information was unnecessary to their theory of racial motivation. All of the information that the defense had obtained was consistent with appellant's beliefs that LT Lotz was racially prejudiced and treated appellant in a discriminatory manner. In the estimation of defense counsel, racial bias was their strongest defense.

Additionally, to paraphrase what we said in *United States v. Loving*, 41 MJ at 242, the defense team may have been

> aware of psychological literature stating that criminals use "alcohol and drugs to 'get up their nerve' to commit crimes" and were concerned that appellant's use of drugs would be viewed as an aggravating factor rather than a mitigating factor. Govt.App. Ex. 2 at 7. *See Rogers v. Zant*, 13 F.3d 384 (11th Cir.) (decision not to investigate possible defense based on drug use was reasonable where counsel knew that local jury would likely react hostilely to such a defense), *cert. denied*, [— U.S. ——] 115 S.Ct. 255 [130 L.Ed.2d 175] (1994); *Wilkins v. Iowa*, 957 F.2d 537, 541 (8th Cir.1992) (failure to present evidence of voluntary intoxication a "reasonable professional judgment[ ]" because jury might be unsympathetic to "self-induced intoxication").

While counsel here may not have been aware of this literature, *Rogers* and *Wilkins* indicate jury hostility to voluntary intoxication is a matter of common knowledge.

Furthermore, a voluntary-intoxication defense could be impeached by appellant's actions, detailed confession, and the detailed statements to the psychiatrist at the sanity board. These recollections were not likely to come from a mind significantly diminished in capacity by drugs and/or alcohol. Thus, such facts may well have made the defense appear contrived. The Court of Military Review asserted that, while expert testimony concerning the blood alcohol level at the time of the killings "has a superficial appeal at first glance, it ignores the evidence." 38 MJ at 539. Senior Judge Strickland went on to say: "As a result, we conclude that counsel's action in merely referring to the appellant's blood alcohol level during argument was reasonable under all of the facts...." *Id.* at 540.

### (3) Sentencing Argument

 The length or substance of closing argument does not by itself establish lack of counsel's competence. We were not there to observe the pauses and facial reactions. Appellant alleges ineffectiveness among other reasons for failure to make a rebuttal argument. The majority of jurisdictions that have considered this issue have held that waiver of closing argument is not ineffective assistance of counsel *per se* and is, in fact, a valid tactical decision in certain situations. In fact, waiver of argument during a capital proceeding "is a legitimate trial tactic." *Cone v. State*, 747 S.W.2d 353, 357 (Tenn. Crim.App.1987). Likewise, failure to give a detailed argument is not ineffectiveness. *Flamer v. State*, 585 A.2d 736, 754–55 (Del. Supr.1990); *Stokes v. State*, 688 S.W.2d 19, 24 (Mo.App.1985).

Here, counsel sought to humanize appellant by establishing that he was a good, law-abiding person raised in a loving, caring Christian family. It is inappropriate to review just the sentencing argument in isolation. As in all military cases there is a complete verbatim record (of 834 pages) in which we find over 40 pages of the defense effort to present a picture of appellant not only through his mother's own words but also through the words of over 27 individuals who knew appellant from his community in Wichita. This testimony established that appellant was well respected in his family, church, school, and the various jobs that he held. In effect, the testimony from these witnesses was the functional equivalent of an extended argument for a case for a life sentence for appellant.

#### (4) Inexperience of Counsel

 At the time of appellant's court-martial, Major Boyett had been involved in thousands of cases and had tried over 100 contested general courts-martial. Captain Lambert had been a defense counsel for approximately 10 months, had been a prosecutor for approximately 1 year, and had tried numerous contested general and special courts-martial. While in law school, he was an assistant trial counsel and later served as a summer intern as an assistant prosecutor in a civilian district attorney's office. Both were fully certified and sworn in accordance with Articles 27(b) and 42(a), UCMJ, 10 USC §§ 827(b) and 842(a), respectively.

These defense counsel made ten pretrial motions. They sought dismissal of the charges based on: lack of subject-matter jurisdiction and multiplicity of Charges II–IV and Additional Charges I–V with Charge I. They moved for appropriate relief on the grounds that (1) appellant was denied his right to a jury trial; (2) the minor charges, Charges II–IV and Additional Charges I–V, should have been referred to a different court-martial; (3) Charges II–IV and Additional Charges I–V should have been severed from Charge I; (4) appellant was entitled to "a preliminary ruling on admissibility of all demonstrative evidence" tending to inflame the members; (5) appellant was entitled to a grand-jury presentment or indictment; and (6) the death penalty and the mandatory minimum "imprisonment for life" provision of Article 118 were unconstitutional. Finally, trial defense counsel filed a *motion in limine* to "exclude ... certain personal characteristics of Lt Lotz."

The Supreme Court in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), decided the same day as *Strickland,* rejected the idea that the experience of counsel determines effectiveness. The Supreme Court reversed the decision that found the appointed defense counsel ineffective because he was a "young lawyer with a real estate practice" who had never before participated in a jury trial. 466 U.S. at 649, 665, 104 S.Ct. at 2041, 2050. The Court held that "[t]he character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation." The Court noted that "[e]very experienced criminal defense attorney once tried his first criminal case." 466 U.S. at 665, 104 S.Ct. at 2050. A challenge to ineffectiveness is judged by the *Strickland* and *Fretwell* standards which were addressed earlier.

#### (5) Change of Venue

 Appellant argues that the defense counsel should have asked for a change of venue because of pretrial publicity. However, pretrial publicity standing alone, no matter how widespread, is not a sufficient reason for a change of venue. As will be discussed in Issue XV, the defense is not entitled to have such a motion granted unless it is shown that such publicity has permeated the panel members. In most instances a motion for a change of venue takes place after the *voir dire.* But "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county...." *Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). However, a showing of actual prejudice is usually necessary before a change of venue is granted. In this case the pretrial publicity had not so permeated the courtroom that the defense was left with promises of members to disregard what they might have heard.

Thus, we hold that counsel were not ineffective in failing to make a motion for a change of venue.

#### (6) *Voir Dire*

As discussed earlier, trial defense counsel had good tactical reasons for not pursuing during *voir dire* appellant's intoxication or abuse of alcohol. Instead counsel focused on the theme that appellant was provoked by a racist supervisor and that appellant was a religious person from a Christian family.

For the reasons discussed earlier, counsel avoided stressing appellant's intoxication on the night of the murder.

■ As to the allegation that counsel did not question Gunnery Sergeant Davenport or Staff Sergeant Edwards, no questions were asked because the defense thought as black court members they would be more able "to relate" to the defense. Additionally, defense counsel did not have to ask many questions because they were already asked by the prosecutor during his *voir dire*. Just as one would not cross-examine when the direct examination was ineffective or did not bring out important points, defense counsel decided that a more in-depth *voir dire* of these two members might lead to a prosecution challenge for cause, a risk the defense did not want to take.

### (7) Failure to Object to Misstatements During *Voir Dire*

Appellant argues that defense counsel "failed to object to trial counsel's repeated misstatements of law regarding capital punishment during *voir dire*." Final Brief at 178. Pursuant to RCM 1004(b)(4), (c)(7)(B), and (c)(7)(J), Manual for Courts–Martial, United States (1994 ed.), a sentence of death may not be adjudged in a murder case unless the members find at least one of twelve aggravating factors listed in RCM 1004(c), including (7)(J), commission of another violation of Article 118, or (7)(B), commission or attempted commission of burglary at the time of the murder. Trial counsel in appellant's case notified the defense of the existence of the following aggravating factors:

a. The murder of Joan M. Lotz was committed while the accused was engaged in the commission of a burglary;

b. The accused ... has been found guilty in the same case of another violation of Article 118.

Based on these factors, there could be no death sentence if appellant were found guilty only of murdering LT Lotz because both of the submitted aggravating factors required the murder of Mrs. Lotz.

■ Appellant argues that "trial counsel stated a death sentence was authorized if the accused was found guilty of *either* specification of Charge I." Final Brief at 178. Further, appellant states: "If, however, the accused were found guilty of only the premeditated murder of 1 Lt. Lotz, a death sentence would not be authorized, because there could be no finding of an aggravating factor alleged in Appellate Exhibit II." *Id.* at 178–79. Appellant asserts that trial defense counsel should have objected to this incorrect explanation. Final Brief at 179 (citing R. 84, 125, 142, 193, 206, 227, 238, 268–69, 291).

While trial counsel indicated that the death penalty was authorized if the members found appellant guilty of either specification under Charge I, he premised that authorization on the finding of an aggravating factor. Here is what he said:

> [I]f this accused is found guilty of either specification of Charge I and you further determine that a certain aggravating factor exists, the military judge will instruct you that the death penalty will be an applicable punishment in this case....

Therefore, nothing trial counsel said misstated the requirements of RCM 1004(b) or (c). Further, even if trial counsel had misstated these requirements, the military judge correctly instructed the members with regard to the requirements of the rule and the appropriate aggravating factors. *See United States v. Loving*, 41 MJ 213 (1994).

We hold that, even if trial counsel had misled the members, appellant was not prejudiced because the members found him guilty of premeditated murder of both LT and Mrs. Lotz.

### (C) Conclusion.

■ Thus, we hold that the choices made by counsel which are challenged here were reasonable under the facts of this case. We will not engage in an intrusive hindsight analysis of the very sort that *Strickland* warned against. The record before us reveals that the choices by counsel were strategic ones made to deal with a very difficult set

of facts. These choices were reasonable and should not be disturbed by us. We reaffirm the "strong presumption" of competence and the highly deferential standard of review set out by the Supreme Court. In any event, any potential errors were not "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. at 369, 113 S.Ct. at 842, *quoting Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064.

### ISSUE II

WHETHER APPELLANT HAS BEEN DENIED HIS RIGHT TO MEANINGFUL APPELLATE REVIEW BY THE LOWER COURT'S REFUSAL TO ADDRESS OVER SEVENTY ISSUES BROUGHT ON REMAND.

### ISSUE III

WHETHER THE LOWER COURT FAILED TO COMPLY WITH THIS HONORABLE COURT'S REMAND DIRECTIONS.

■■■ The defense objects to the Court of Military Review's disposing of some issues only by mentioning them in a footnote or in a heading. Final Brief at 232. However, this Court in *United States v. Clifton*, 35 MJ 79, 81 (1992), held that Courts of Military Review are not required to address specifically in writing all assigned errors so long as the written opinion notes the errors and finds them without merit. *See also United States v. Matias*, 25 MJ 356, 361 (CMA 1987), *cert. denied*, 485 U.S. 968, 108 S.Ct. 1242, 99 L.Ed.2d 441 (1988). That was done in this case. This is not only common for the Courts of Military Review, but for this Court and other appellate courts as well.

We note that defense counsel has raised issues that could just as well have been combined in a single issue as illustrated by Issues XIV through XXII (except XV). *See also* Issues XXVIII, XXIX, XXXV and XXXVI. Understandably defense counsel in capital cases do so because they are seeking to avoid waiver in a later *habeas corpus* action. However, an appellate court is not obligated to list the issues in the same manner as the defense has done. We are satisfied that the Court of Military Review complied with this Court's remand and our holding in *Clifton*.

### ISSUE IV

WHETHER APPELLANT IS ENTITLED TO REPRESENTATION BY COUNSEL QUALIFIED UNDER THE AMERICAN BAR ASSOCIATION (ABA) GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989) ON APPEAL AND TO UNINTERRUPTED CONTINUITY OF COUNSEL UNAFFECTED BY PEACETIME MILITARY PERSONNEL DECISIONS.

This Court has rejected a requirement for appointment of ABA qualified counsel twice in summary dispositions (*United States v. Gray*, 34 MJ 164 (CMA 1991); *Curtis v. Stumbaugh*, 31 MJ 397 (CMA 1990)), and in the opinion in *United States v. Loving*, 41 MJ at 300. The Guidelines specifically state that "[t]he American Bar Association recommends adoption of these Guidelines, subject to such exceptions as may be appropriate in the military...." *United States v. Gray*, 32 MJ 730, 733 (ACMR 1992). The few states that have rules on the matter have not adopted the guidelines in total. *See* Rule 20(c), Cal. Rules of Court Appendix (West's Ann. Cal. 23, Pt. 2 (Pamphlet)); [4] § 17–12–

4. The California Rule provides: "(c) [Supreme Court] The Supreme Court should maintain a list of attorneys for appointment in death penalty cases, based on the following minimum qualifications: (1) active practice of law for four years in the California state courts or equivalent experience; (2) attendance at three approved appellate training programs, including one program concerning the death penalty; (3) completion of seven appellate cases, one of which involves a homicide; and (4) submission of two appellant's opening briefs written by the attorney, one of which involves a homicide, for review by the court or administrator."

61, Ga.Code Ann. (1981); Rule 65.II(B), Ohio Common Pleas Superintendence Rules;[5] Section .0508(b)(1), North Carolina Rules of Court, N.C. State Bar Rules, *Model Plan for Appointment of Counsel for Indigent Defendants in Certain Criminal Cases;*[6] § 16–3–26(B), S.C.Code Ann. (1985); Rule 13.1, Tennessee Supreme Court Rules.[7] *Cf.* 18 USC § 3005 (defendant entitled to 2 attorneys "at least 1 shall be learned in the law applicable to capital cases"); *see also* § 3006(A) (Each district court shall set up a plan as to adequate representation for indigents.).

 Major Boyett, appellant's lead counsel at trial, seems to us to be well schooled in death penalty cases. He had extensive questions on death-qualified jurors in constitutional challenges to the military system. Additionally, he was very sensitive to the racial composition of the court members as he made a *Batson* challenge. *See also* Issues IX, X, and XI. As we have held in the past, it is not error that appellant was not represented by counsel qualified under the ABA Guidelines. *United States v. Loving,* 41 MJ at 300.

 As to the continuity of counsel, the Sixth Amendment guarantees the right to the effective assistance of counsel. While we have been concerned with the continuity of counsel, *United States v. Loving,* 41 MJ at 299; *United States v. Murphy,* 39 MJ 437 (1994), the appropriate inquiry focuses not on the relationship between counsel and appellant but on whether appellant has enjoyed the effective assistance of counsel. *United States v. MacCulloch,* 40 MJ 236, 238 (CMA 1994). We have already addressed this question in Issue I.

5. The Ohio Rule provides: "(B) Appellate counsel. (1) At least two attorneys shall be appointed by the court to appeal cases where the trial court has imposed the death penalty on an indigent defendant. At least one of the appointed counsel shall maintain a law office in Ohio.

(2) Appellate counsel shall satisfy all of the following:

a. Be admitted to the practice of law in Ohio or admitted to practice pro hac vice;

b. Have at least three years of civil or criminal litigation or appellate experience;

c. Have specialized training, as approved by the Committee, on subjects that will assist counsel in the defense of persons accused of capital crimes in the two years prior to making application;

d. Have specialized training, as approved by the Committee, on subjects that will assist counsel in the appeal of cases in which the death penalty was imposed in the two years prior to making application;

e. Have experience as counsel in the appeal of at least three felony convictions in the three years prior to making application."

6. The North Carolina Rule provides: "(b)(1) No attorney shall be appointed to represent at the appellate level any indigent defendant convicted of a capital crime

(A) who has less than five years of experience in the general practice of law, provided, however, that the court or, where authorized, the public defender, may, as a matter of discretion, appoint as assistant counsel an attorney who has less experience; or

(B) who has not been found by the court or the public defender to have a demonstrated proficiency in the field of appellate practice.

(2) For the purpose of this section, the term "general practice of law" shall be deemed to include service as a prosecuting attorney in any district attorney's office."

7. The Tennessee Rule provides: "1. Appointment of Counsel. In every criminal case in which an adult is charged with a felony ... where the defendant is in jeopardy of incarceration, ... [and] the party states that the party is financially unable to obtain counsel and desires the appointment of counsel, ... [u]pon a finding of indigency, counsel shall be appointed...."

* * *

"The Court shall, in selecting and appointing such counsel, either designate the Public Defender Service, if such service is available, or private attorney selected from a panel of attorneys approved by the Court. The party shall not have the right to select the appointed counsel from the Public Defender Service, from the panel of attorneys, or otherwise.

Counsel appointed shall, unless excused by order of the Court, continue to act for the party throughout the proceedings of the trial and of any appeal.

In a capital case two attorneys may be appointed for one defendant and each is eligible for compensation...."

## ISSUE V

**WHETHER THE LACK OF AN INDE-PENDENT DEFENSE COMMAND IN THE NAVAL JUSTICE SYSTEM CON-STITUTED IMPROPER COMMAND INFLUENCE IN THAT IT DEPRIVED APPELLANT OF DUE PROCESS OF LAW AT TRIAL AND ON APPEAL.**

■ Congress has not required a separate defense counsel corps, and we will not exercise our supervisory authority to require an independent defense counsel command. Both Article 37, UCMJ, 10 USC § 837, and *Strickland* adequately protect the rights of military accused at trial.

## ISSUE VI

**WHETHER SPECIFICATIONS 2 AND 3 OF CHARGE II FAIL TO STATE AN OFFENSE BECAUSE THEY DO NOT ALLEGE A LEGALLY–RECOGNIZED OWNER AND BECAUSE THEY FAILS [SIC] TO STATE THE VALUE OF EI-THER OF THE AUTOMOBILES.**

■ The defense argues that since the subject of the larceny is listed as the property of LT Lotz and/or his wife it does not state an offense. Para. 46c(1)(c)(iv), Part IV, Manual, *supra,* includes "an estate" within the term "person." Therefore, we hold that the fact that the Lotz were not alive at the time of the larceny is not a fatal variance. *See United States v. Atkinson,* 39 MJ 462 (CMA 1994); *United States v. Turner,* 27 MJ 217 (CMA 1988).

## ISSUE VII

**WHETHER CHARGES II–IV AND AD-DITIONAL CHARGES I–V ARE MUL-TIPLICIOUS FOR FINDINGS AND SENTENCING INASMUCH AS THEY WERE PART OF ONE CONTINUOUS COURSE OF CONDUCT PROHIBITED BY CHARGE I (PREMEDITATED MURDER).** *But see United States v. Tet-ers,* 37 MJ 370 (CMA 1993).

Based on *United States v. Teters,* 37 MJ 370 (CMA 1993), *cert. denied,* 510 U.S. 1091, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994), and *United States v. Wheeler,* 40 MJ 242 (CMA 1994), we hold this issue is without merit.

## ISSUE VIII

**WHETHER THE CONVENING AU-THORITY ABUSED HIS DISCRETION IN REFERRING BOTH SERIOUS AND MINOR OFFENSES TO THE SAME COURT.** ·

RCM 601(e)(2) provides: "In the discretion of the convening authority, two or more offenses charged against an accused may be referred to the same court-martial for trial, whether serious or minor offenses or both." A military judge may, however, grant a motion to sever charges "to prevent manifest injustice." RCM 906(b)(10).

Courts have looked at three factors in determining whether joinder of offenses is improper:

> One factor which carries great weight is the findings, themselves, which may reveal whether or not an impermissible crossover caused the presence of a charge on which the evidence was strong to result in conviction of charges on which the evidence was relatively weak. Another such factor is whether or not evidence of the other offenses, although not charged, would have been admissible in a trial of the charged offense. A third such factor is whether or not the military judge provided the members with a proper limiting instruction.

*United States v. Silvis,* 31 MJ 707, 709 (NMCMR 1990) (citations omitted), *aff'd on other grounds,* 33 MJ 135 (CMA 1991). Application of these factors to the case at bar supports the military judge's decision to deny the motion to sever.

First, the evidence against appellant on *all* the offenses was overwhelming. *United States v. Haye,* 29 MJ 213 (CMA 1989). Appellant gave investigators three separate statements concerning the offenses (pros.ex. 35–37); consequently, the defense made a tactical decision to focus its efforts primarily on the degree of guilt and the "case for life."

■ Second, trial defense counsel conceded, when litigating the multiplicity-for-

findings motion, that the evidence of the complained-of offenses would have been admissible at trial on the issue of premeditation and as factual circumstances surrounding the murders of LT and Mrs. Lotz (R. 33), thus negating appellant's claim of prejudicial "spillover." Final Brief at 258–59.

Finally, appellant's claim of prejudice is belied by his failure to seek a limiting instruction at trial. *See, e.g.,* 31 MJ at 709 (court upheld military judge's decision not to sever charges; although "military judge did not give any kind of limiting instruction, . . . he was not requested by either party to do so").

Appellant, relying on *United States v. Sturdivant,* 9 MJ 923 (ACMR 1980), *rev'd on other grounds,* 13 MJ 323 (CMA 1982), claims that the numerous charges leveled against appellant made him "appear to be a bad man." Final Brief at 259. In *Sturdivant,* however, the Government took "what [was] essentially one transaction, appellant's effort to buy his monthly measure of marijuana, and multiplied it into ten offenses, with a resultant conviction of seven (one attempt, three conspiracies, and three solicitations)." 9 MJ at 927.

By contrast, Curtis was convicted of eight distinct charges whose underlying specifications all contained separate and distinct legal and factual elements accurately reflecting appellant's criminal conduct. Because this was not a case "where a single criminal offense [was] exaggerated into many seemingly separate crimes so as to create the impression that the accused is a bad character and therefore lead the court-martial to resolve against him doubt created by the evidence," appellant is not entitled to relief. *United States v. Baker,* 14 MJ 361, 365 (CMA 1983), *overruled in part, United States v. Teters,* 37 MJ 370 (CMA 1993), *cert. denied,* 510 U.S. 1091, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994).

We hold that the judge did not abuse his discretion by refusing to grant appropriate relief in the form of severance of the charges.

## ISSUE IX

WHETHER APPELLANT KNOWINGLY AND INTELLIGENTLY WAIVED HIS ARTICLE 38(B)(2) STATUTORY RIGHT TO CIVILIAN COUNSEL AND HIS ARTICLE 38(B)(3)(B) STATUTORY RIGHT TO MILITARY COUNSEL OF HIS OWN SELECTION WHERE MILITARY COUNSEL FAILED TO ADVISE APPELLANT OF HIS PROFESSIONAL DEFICIENCIES WHICH INCLUDED NO CAPITAL EXPERIENCE, NO CAPITAL TRAINING, AND INEXPERIENCE IN SOPHISTICATED LITIGATION, AND FAILED TO ADVISE APPELLANT THAT HE HAD DETAILED HIMSELF TO THE CASE.

## ISSUE X

WHETHER APPELLANT KNOWINGLY AND INTELLIGENTLY WAIVED HIS ARTICLE 38(B)(2) STATUTORY RIGHT TO CIVILIAN COUNSEL AND HIS ARTICLE 38(B)(3)(B) STATUTORY RIGHT TO MILITARY COUNSEL OF HIS OWN SELECTION WHERE THE MILITARY JUDGE MISLED APPELLANT BY STATING THAT HIS COUNSEL WERE "QUALIFIED LAWYERS" AND THAT HIS LEAD COUNSEL WAS A "LAWYER OF CONSIDERABLE EXPERIENCE," WHEN NEITHER COUNSEL HAD TRIED A CAPITAL CASE, TRIED A MURDER CASE, OR RECEIVED ANY DEATH PENALTY CONTINUING LEGAL EDUCATION.

## ISSUE XI

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO INQUIRE AS TO THE IDENTITY AND PRACTICE OF THE AUTHORITY WHO DETAILED MILITARY DEFENSE COUNSEL AND IN FAILING TO ENSURE THAT COUNSEL WERE QUALIFIED IN TRAINING, EXPERIENCE, AND EDUCATION TO DEFEND A CAPITAL CASE.

This is simply another way of raising the issue of ABA qualified counsel, which we have rejected. Issue IV. The judge appropriately advised appellant of his right to

counsel, and we hold that appellant did knowingly and intelligently waive his right to civilian or individual military counsel. We are quite certain that counsel were qualified to defend this capital case. We reject appellant's arguments on these issues.

## ISSUE XII

WHETHER ARTICLE 18, UCMJ AND RCM 201(F)(1)(C), WHICH REQUIRE TRIAL BY MEMBERS IN A CAPITAL CASE, VIOLATE THE FIFTH AND EIGHTH AMENDMENT GUARANTEE OF DUE PROCESS AND A RELIABLE VERDICT.

We rejected this argument in *United States v. Loving*, 41 MJ at 291, citing *United States v. Matthews*, 16 MJ 354, 363 (CMA 1983). In *Matthews* we said: "Once again, the unique nature of capital punishment provides adequate justification for the distinction which Congress has made in this regard."

## ISSUE XIII

WHETHER APPELLANT WAS DENIED HIS FIFTH AMENDMENT RIGHT TO A GRAND JURY PRESENTMENT OR INDICTMENT.

The Fifth Amendment states in relevant part:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger.

■ The defense argues that the language, "when in actual service in time of War or public danger" limits the military exclusion. This argument was long ago rejected by the Supreme Court, which said "that the words, . . . 'when in actual service in time of war or public danger' . . . apply to the militia only." *Johnson v. Sayre*, 158 U.S. 109, 115, 15 S.Ct. 773, 776, 39 L.Ed. 914 (1895).

Even though the absolute requirement for a grand-jury indictment in courts-martial has been rejected by the Supreme Court, Article 32, UCMJ, 10 USC § 832, grants rights to the accused greater than he or she would have before a civilian grand jury. As we have stated:

For example, an accused is entitled to appear at the Article 32 hearing, have appointed counsel, cross-examine the witnesses against him, examine the evidence against him, and present matters in defense, extenuation, or mitigation if he desires. *See* Art. 32(b); RCM 405(f). . . .

*United States v. Loving*, 41 MJ at 297. A defendant has no such rights at a grand jury. Thus, we hold that appellant was not denied any Fifth Amendment right to a grand-jury presentment or indictment.

## ISSUES XIV through XXIII
### (Excluding XV)

XIV. WHETHER ARTICLE 25(C)(1)'S EXCLUSION FROM COURT–MARTIAL SERVICE OF ENLISTED MEMBERS OF THE SAME UNIT AS THE ACCUSED INJECTS AN IMPROPER CRITERION (ENLISTED STATUS) IN SELECTING THE MEMBERS POOL.

XVI. WHETHER COURT–MARTIAL PROCEDURES DENIED APPELLANT HIS ARTICLE III RIGHT TO A JURY TRIAL.

XVII. WHETHER THE CONVENING AUTHORITY UNDERSTOOD THE LAW AND HIS OPTIONS (INCLUDING DETAILING AN ALL–ENLISTED COURT AND RANDOM SELECTION OF MEMBERS FOR HIS FURTHER SCREENING) REGARDING DETAILING ENLISTED MEMBERS PURSUANT TO ARTICLE 25.

XVIII. WHETHER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS DO PERMIT, IN PEACETIME, A CONVEN-

ING AUTHORITY TO HAND-PICK MILITARY SUBOR-DINATES, WHOSE CAREERS HE CAN DIRECTLY AND IM-MEDIATELY AFFECT AND CONTROL, AS MEMBERS TO DECIDE A CAPITAL CASE FOR OFFENSES THAT OC-CUR ON A MILITARY BASE BUT WHERE THERE IS CON-CURRENT JURISDICTION WITH A STATE AUTHORITY.

XIX. WHETHER COURT-MARTIAL PROCEDURES DENIED AP-PELLANT HIS SIXTH AMENDMENT RIGHT TO JURY TRIAL AND AN IMPAR-TIAL CROSS-SECTION OF THE COMMUNITY.

XX. WHETHER APPELLANT WAS DENIED HIS FIFTH AMEND-MENT RIGHT TO DUE PRO-CESS OF LAW BY UNLAW-FUL COMMAND ACTION IN DETAILING 18 MALE PANEL MEMBERS, INTENTIONAL-LY DISCRIMINATING AGAINST WOMEN BY EX-CLUDING THEM FROM THE COURT.

XXI. WHETHER THE GOVERN-MENT MAY MAKE A *WITHERSPOON* CHAL-LENGE AFTER THE CON-VENING AUTHORITY EX-ERCISES HIS ARTICLE 25 STATUTORY RESPONSIBILI-TY IN DETAILING MEM-BERS.

XXII. WHETHER THE PRESIDENT EXCEEDED HIS ARTICLE 36 POWERS TO ESTABLISH PROCEDURES FOR COURTS-MARTIAL WHEN HE GRANT-ED THE TRIAL COUNSEL A PEREMPTORY CHALLENGE AND THEREBY THE POWER TO NULLIFY THE CONVEN-ING AUTHORITY'S ARTICLE 25(D) STATUTORY AUTHORI-TY TO DETAIL MEMBERS OF THE COURT.

XXIII. WHETHER THE PEREMPTO-RY CHALLENGE PROCE-DURE IN THE MILITARY JUSTICE SYSTEM VIOLATES THE FIFTH AND EIGHTH AMENDMENTS IN CAPITAL CASES WHERE THE PROSE-CUTOR IS FREE TO REMOVE A MEMBER WHOSE MORAL BIAS AGAINST THE DEATH PENALTY DOES NOT JUSTI-FY A CHALLENGE FOR CAUSE.

These issues are broad-based attacks on the selection of court members for appellant's court-martial. This includes the right to a civilian jury—Issues XVI and XIX; selection of the court members—Issues XVIII and XXI; employment of peremptory challenges—Issue XXII; the pool from which selections are made—Issues XIV and XVII; gender discrimination—Issue XX; and a *Witherspoon* violation—Issues XXI and XXIII.

 *Congressional Discretion.* We will first consider the overall basis for the process of selecting court members. This is found in Articles 25, 29, and 41, UCMJ, 10 USC §§ 825, 829, and 841, respectively. The Constitution in Article I grants to Congress the power "To make Rules for the Government and Regulation of the land and naval Forces." Art. I, § 8, cl. 14. Resolution of these issues requires consideration of the purpose of the military and the Constitutional and Codal rights guaranteed to members of the Armed Forces. The "primary business of armies and navies [is] to fight or be ready to fight wars should the occasion arise." *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955). The Supreme Court just recently recognized judicial "deference to the determination of Congress, made under its authority to regulate the land and naval forces." *Weiss v. United States,* 510 U.S.

163, 177, 114 S.Ct. 752, 760, 127 L.Ed.2d 1 (1994). This Court will thus give deference to the statutory scheme set up by Congress concerning the selection pool and/or challenges in the military system.

*Right To Civilian Jury.* As to Issues XVI and XIX, the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." While this language would seem to include courts-martial, the Supreme Court has indicated that servicemembers have never had a right to a trial by jury. *See Solorio v. United States,* 483 U.S. 435, 453, 107 S.Ct. 2924, 2934, 97 L.Ed.2d 364 (1987) (Marshall, J., dissenting) (says decision rejects right to indictment by grand jury and trial by jury of one's peers even if offense not service connected); *Ex parte Quirin,* 317 U.S. 1, 39–43, 63 S.Ct. 2, 16–19, 87 L.Ed. 3 (1942) (dictum); *Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 107, 123, 18 L.Ed. 281 (1866); *United States v. McClain,* 22 MJ 124, 128 (CMA 1986); *United States v. Jenkins,* 20 USCMA 112, 114, 42 CMR 304, 306 (1970). We hold that appellant does not have a right to a civilian jury selected from the civilian community.

*Role of Convening Authority.* As to Issues XVIII, XXI, XXII, and XXIII, the defense argues that since the convening authority appoints the members, the prosecution may not peremptorily challenge [8] a court member because they do not believe in the death penalty. There is no opinion or any Code or Manual provision that supports this argument. There is, however, dictum in *United States v. Carter,* 25 MJ 471, 478 (CMA 1988) (Cox, J., concurring), suggesting that, since the convening authority selects the members, the prosecution has in effect more than one peremptory challenge.

However, in *United States v. Loving,* 41 MJ at 296–97, we rejected the argument that the role of the convening authority in personally appointing members would violate the right to a fair and impartial trial. We recognized that protections are available to prevent court stacking or attempting to influence court members. *Id.* at 297.

*Selection Pool.* As to Issues XIV and XVII, we hold that exclusion of enlisted members from appellant's unit was a proper exercise of congressional discretion in designing the military justice system. This choice is entitled to deference. The defense also has asked for a *DuBay* hearing to determine if the convening authority knew that there could have been a panel of all enlisted members. Article 25(c)(1), UCMJ, 10 USC § 825(c)(1), provides:

> Any enlisted member of an armed force on active duty who is not a member of the same unit as the accused is eligible to serve on general and special courts-martial for the trial of any enlisted member of an armed force who may lawfully be brought before such courts for trial, but he shall serve as a member of a court only if, before the conclusion of a session called by the military judge under section 839(a) of this title (article 39(a)) prior to trial or, in the absence of such a session, before the court is assembled for the trial of the accused, the accused personally has requested orally on the record or in writing that enlisted members serve on it. After such a request, the accused may not be tried by a general or special court-martial the membership of which does not include enlisted members in a number comprising at least one-third of the total membership of the court, unless eligible enlisted members cannot be obtained on account of physical conditions or military exigencies . . . .

In its attacks on Article 25, the defense argues that exclusion of members of the enlisted ranks is an exclusion forbidden by the Constitution. However, it was not until after World War II, in the Elston Act (Pub.L. No. 759, 62 Stat. 604 (1948)), that Congress first provided for appointment of enlisted mem-

---

8. Issue XXII asserts that the President granted trial counsel a peremptory challenge. In fact Article 41(b)(1), UCMJ, 10 USC § 841(b)(1), did that.

bers to serve as court members. Even then, the enlisted members were generally required to have not "less than two years' service." *See United States v. McClain*, 22 MJ 124, 129 (CMA 1986).

■ If the defense wanted to explore the convening authority's role and knowledge, they could have raised this issue at trial. Because it was not raised at trial, we hold that this issue was waived.

*Gender Discrimination.* As to Issue XX, the defense argues that there was an intentional exclusion based on gender. In support of its argument, the defense cites *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), and emphasizes that a notation on a routing slip of the first name of several members establishes gender discrimination.

The fact that no women were detailed to the panel, the defense alleges, "is not mere coincidence." Final Brief at 305. The defense asserts that since the first names were penned in on the nominee list, this was used to exclude women.

■ The Supreme Court (*see Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *see also People v. Blackwell*, 164 Ill.2d 67, 207 Ill.Dec. 44, 646 N.E.2d 610 (1995)); the Manual for Courts–Martial (RCM 912(b)(3)); and Fed.R.Crim.P. 12(b) provide, absent plain error, that failure to raise the issue of a systemic exclusion of a group is waived if the issue is not raised when it is discovered. The defense challenge is to failure to select any females as court members. The failure to raise this issue at trial constitutes waiver. In any event the burden of proof is upon the defense to show improper selection by the convening authority. *United States v. McClain*, 22 MJ at 132; *United States v. James*, 24 MJ 894, 896 (ACMR 1987).

The defense reliance on *J.E.B.* is misplaced. *J.E.B.* supports the proposition that failure to raise the issue is a waiver. In *J.E.B.*, as in *Batson*, the parties must raise the issue of discriminatory challenges at trial.

In *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the Supreme Court reversed the Court of Appeals for failure to apply waiver when alternative jurors sat during deliberations without the defendant's express consent. Justice O'Connor, speaking for the Court, held that Fed.R.Crim.P. 24(c) had been violated, but there was no plain error because the defendants were not prejudiced "either specifically or presumptively." 507 U.S. at 739, 739–41, 113 S.Ct. at 1780, 1781. The Court acknowledged:

> "In theory, the presence of alternate jurors during jury deliberations might prejudice a defendant in two different ways: either because the alternates actually participated in the deliberations, verbally or through 'body language'; or because the alternates' presence exerted a 'chilling' effect on the regular jurors."

507 U.S. at 739, 113 S.Ct. at 1780. The defendants "made no specific showing" that there was improper participation, *id.* at 739, 113 S.Ct. at 1781; therefore, the Court held there was waiver.

While this is arguably different from *United States v. Loving, supra*, "we hold that appellant has failed to make a *prima facie* showing of noncompliance with Article 25 or the systemic exclusion of otherwise qualified court members based on ... gender." 41 MJ at 287.

*Witherspoon Violation.* As to Issues XXI and XXIII, these were both resolved against appellant in *United States v. Loving*, 41 MJ at 294–95.

### ISSUE XV

WHETHER THE ACCUSED WAS DENIED A FAIR AND IMPARTIAL HEARING BECAUSE OF ADVERSE PRETRIAL PUBLICITY AND RACIAL DISCRIMINATION AGAINST APPELLANT.

■ Appellant has a Sixth Amendment right to a fair and impartial jury. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Chandler v. Florida*, 449

U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). We will address individually each of the court members and the impact of pretrial publicity on this right.

The defense argues that COL Campbell and COL Van Ryzin had heard media accounts of the murders. However, these two members were dismissed for cause.

LTC Ford was asked the following:

TC: Now, Colonel Ford, have you heard anything about this case previously, for example, newspaper reports, radio, television, et cetera?

MEM(LTCOL FORD): The only—truly, I may have heard something, but the only thing I remember that sticks in my mind is a newspaper article a few weeks back that said there was going to be enlisted members on the court. That's all.

TC: Sir, can you previously—excuse me—could you disregard anything that you have previously heard concerning this case and consider only the evidence presented in open court in making your decision in this case?

MEM(LTCOL Ford): Yes.

The defense followed up:

DC: Just simply, have you ever heard about the fact that there was an alleged killing aboard the base?

MEM(LTCOL Ford): Yes.

DC: How did you come to learn of this anyway?

MEM(LTCOL FORD): I think the morning it happened I was in [sic] work, and somebody said there had been a stabbing somewhere around the quarters out near the "O" club.

DC: Did anyone discuss any more of the matter at any other time?

MEM(LTCOL FORD): Later on I heard from one of the battalion commanders that he knew the people involved but it was a passing type thing, and I didn't get involved in the discussion. He was on his way in to see the regimental commander. It was the CO of 2/10.

DC: How did he express the fact that he knew the people that were involved?

MEM(LTCOL FORD): It seemed to me that his wife knew the lady involved, and he was going to take the day off to go with his wife or something. It wasn't a long involved conversation, and I didn't get involved in it.

The judge followed up on these questions.

———

LTCOL Smith testified that he personally knew LT Lotz. The judge told the defense that he would entertain a challenge for cause, but the defense specifically declined to challenge him. Later, the defense did challenge this member for cause, and it was granted.

———

MAJ Beale testified as to his knowledge as follows:

TC: Now, Major Beale, and we'll—have you heard anything about this case previously, and by this I mean radio, newspapers, television, or any other—in any other manner?

MEM(MAJ BEALE): The only thing that I heard at all about this particular case was my company and myself were deployed—

TC: Could you speak a little slower, please?

MEM(MAJ BEALE): My company and myself were deployed in Solid Shield, okay, evidently when this occurred. The only thing that I know is that something had happened because one of my lieutenants had heard that this had happened, and that's—I wasn't even—I didn't—I did not—I have not seen the—any TV reports or anything else about it. That's all I know. It's just kind of hearsay, which was, you know, that something had happened over in quarters there.

TC: Okay. And that's—you haven't heard anything on the radio?

MEM(MAJ BEALE): Just a mention that there had been a murder and that was that.

However, the defense declined to challenge him for cause.

MAJ Williams testified that he knew the following:

MJ: All right. Major, are you aware of any matter which you believe would be a basis for a challenge against you by either side in this case?

MEM(MAJ WILLIAMS): Not precisely, sir. I am aware of some of the facts of the case—not facts, but some of the accounts of the case because of the press coverage.

MJ: I believe that counsel are going to ask you to expand on that, but other than that observation do you have anything else, Major, that you think you should make us aware of?

MEM(MAJ WILLIAMS): No, sir.

MAJ Williams' *voir dire* continued:

TC: Now, I'll go into this what you talked about to the judge now. Have you heard anything about this case previously and by this I mean newspapers, radio, TV, other reports, and if so could you tell us what you've heard?

MEM(MAJ WILLIAMS): Yes, sir. Immediately subsequent to the event, I think it was covered in the newspaper approximately three or four days subsequent to that and then it was no longer covered in the newspaper. The charges and the specifications I believe are—except for about two of them, I recall reading in the newspaper. And the two that I do not recall reading in the newspaper were the sexual assault and the theft of the second car, but other than that I recall reading the accounts of those in the newspaper.

TC: Now, you say you've read accounts about the charges in the newspaper?

MEM(MAJ WILLIAMS): Yes, sir.

TC: Have you read or heard anything else about the case other than this?

MEM(MAJ WILLIAMS): I'm a member of the principal staff of 2d Marine Division and as such there were meetings every day with the Chief of Staff and on three of those occasions during the week the Commanding General, General Murphy, is also present. As I recall two days immediately subsequent to the event it was brought up during the—those meetings. It was in very, very limited discussion. It was basically this is what happened and the General and the Chief of Staff basically said we'll discuss this, you know, later in a more appropriate forum.

TC: Now, Major Williams, you say this is what happened. What is "this?"

MEM(MAJ WILLIAMS): The allegations of the two killings, the event of where it actually happened, the fact that there was—Lieutenant Lotz' automobile was stolen and the actual murder weapon, as I recall.

TC: Okay. That murder weapon was—there was a picture in the paper?

MEM(MAJ WILLIAMS): There was a picture of a K-bar. I don't know if it was the K-bar, but it indicated that this was the murder weapon.

TC: Now, was anything else that you can remember discussed?

MEM(MAJ WILLIAMS): No. sir.

TC: And that's your sole knowledge of this case to this point?

MEM(MAJ WILLIAMS): That's correct.

TC: Now, Major Williams, do you believe that the news media is always accurate in their reporting of the news?

MEM(MAJ WILLIAMS): I do not believe that, sir.

TC: Now, sir, are you personally aware of any instances that the media has been inaccurate in their reporting of the news?

MEM(MAJ WILLIAMS): I think it's part of general knowledge. To say a particular instance, I might be pressed right now, but I would think that I would not consider it as a fact in any case.

TC: That it was reported in the newspaper?

MEM(MAJ WILLIAMS): That's correct.

TC: Or the TV or radio?

MEM(MAJ WILLIAMS): I do not consider that a total [sic] reliable source.

TC: Okay. Now, I want you to think carefully about this question, Major. Do you believe that you can disregard any-

thing that you have previously heard concerning this case and consider only the evidence presented in open court in making your decisions concerning this case?

MEM(MAJ WILLIAMS): Yes, sir, I can.

TC: You're absolutely certain that you can disregard anything that you have previously heard?

MEM(MAJ WILLIAMS): Yes, sir.

The defense was given a chance to examine MAJ Williams fully but did not challenge him for cause, as they had COL Campbell and COL Van Rysin.

---

MAJ Cagiano testified to the following facts concerning the case:

MJ: Major, are you aware of any matters which you believe would be a ground for challenge by either side against you in this case?

MEM(MAJ CAGIANO): Yes, sir, I do.

MJ: All right, please, would you explicate, sir.

MEM(MAJ CAGIANO): Yes, sir. Before coming to Camp Lejeune, I worked in the officer procurement section at Headquarters Marine Corps. And once the—apparently some of the details of this case had been made available to the press, I was called by a recruiting district in Philadelphia. Apparently Lieutenant Lotz' wife had resided there for some time, and the district asked if we could find out anything about a murder of Lieutenant Lotz at Camp Lejeune. They had recruited him from that area and they told me that they believed Mrs. Lotz' father was—had some affiliation with a newspaper in the area and they wanted to know what—was that, in fact, true and what we knew about it.

So, I checked our computer to find something of Lieutenant Lotz so I could go back and research our files and, much to my surprise, I found out that the officer who was working for me at the time happened to had [sic] gone to the same OCS and Basic School Class with Lieutenant Lotz. So, as Marines tend to do, he talked

about Lieutenant Lotz and what he knew of him and his personality, et cetera, et cetera. But after that I went down to the Judge Advocate Division Office at Headquarters and asked them if they had heard of it and what details they could give me, and they gave me some very brief details about what had occurred down here, and we checked with PA [Public Affairs] and just let them know yes, that you can—that it did occur, and they got very, very basic information about the case.

MJ: All right, but you were under then an official compulsion to report the facts as accurately as you could?

MEM(MAJ CAGIANO): Yes, sir.

Based on this, the judge granted a defense challenge for cause against MAJ Cagiano.

---

CPT Emerson testified that he had heard about the case through the media:

TC: Now, Captain Emerson, have you heard anything about this case previously? I mean by newspapers, radio, television, the media, or any other way?

MEM(CAPT EMERSON): Yes, sir.

TC: Could you tell, please, the court what you have heard?

MEM(CAPT EMERSON): Yes, sir. When I—apparently during the—whenever this incident occurred, I returned from leave. I was on leave at the time and it was mentioned to me, of course, and I—by one of my fellow workers. I told him that I was not aware of the incident that had occurred and I went back and found an old newspaper and read an article that this incident did, in fact, happen.

TC: Okay. And what do you remember, Captain Emerson, from reading that newspaper article?

MEM(CAPT EMERSON): I remember reading that a Marine lance corporal—I can't remember whether—I don't remember the name, whether even the name was printed. I do remember it saying a Marine lance corporal is supposedly accused of stabbing a wife—

TC: Speak up a little bit.

MEM(CAPT EMERSON): Stabbing a wife and a husband, a Marine lieutenant, stationed at Camp Lejeune. It mentioned something about a car, I think being overturned, and either the Marine—when the local patrolmen found the car, the Marine was mumbling something to the fact [sic] that he had did [sic] something and somehow I guess they traced—something about they traced the tag back to the resident.

TC: Now, is that all you remember having read about this case?

MEM(CAPT EMERSON): Yes, sir. That's all I remember reading, sir.

TC: Okay, and that's all your knowledge of this case prior to this, is that correct?

MEM(CAPT EMERSON): Yes, sir.

TC: Now, Captain Emerson, do you believe that the news media is always accurate in their reporting of the news?

MEM(CAPT EMERSON): No, sir.

TC: Are you personally aware of any instance that the media has been inaccurate in the reporting of an event?

\* \* \*

MEM (CAPT EMERSON): Yes, sir.

CPT Emerson testified that he could "disregard" what he had heard. As part of the *voir dire,* the defense explained the voting procedure to CPT Emerson. The judge granted the government challenge for cause against CPT Emerson because of his view on the death penalty. *See* 33 MJ at 106–07.

---

2DLT Luster testified that he had heard the following:

TC: Now, Lieutenant Luster, could you tell us what you've heard?

MEM(2DLT LUSTER): Several stories. I didn't know the accused's name or anything. They were just talking—when I first got here——

TC: Now, Lieutenant Luster, could you please speak slowly because the man over here has got to type everything you say.

So, could you speak slowly and distinctly, please?

MEM(2DLT LUSTER): Probably about my second week here a friend just told me that there was a couple that was murdered in the MOQ [Married Officers Quarters] and they were going over some details of, you know, how it—they thought it happened and everything.

TC: Okay, could you tell us, you know, what details you became aware of, Lieutenant Luster?

MEM(2DLT LUSTER): Well, they said that the lieutenant pissed off one of the troops and the troop invited himself to the house, but they were saying that the troop had an invitation, it really wasn't clear, and that the lieutenant was stabbed, and then they're going his wife was stabbed also, and then their car was stolen.

TC: Lieutenant, that is your entire knowledge of this case at this point? Is that everything you know about it?

MEM(2DLT LUSTER): Yes. Besides the reports I've read.

TC: Okay. Now, that's another thing. What reports have you read?

MEM(2DLT LUSTER): I mean just what we were given yesterday.

TC: Okay, thanks, Lieutenant.

Okay, now, I want to ask you a question. Again, if you don't understand it, just let me know. And this calls for you to do some serious thinking, within your own heart on whether—how you answer this question. Can you disregard anything that you've previously heard concerning this case and consider only the evidence presented in open court in making your decision concerning this case.

MEM(2DLT LUSTER): Yes.

TC: Lieutenant Luster, did you know either victim, that being Lieutenant James Lotz or his wife, Joan Lotz?

MEM(2DLT LUSTER): No.

The defense was content not to challenge the junior officers. There was no challenge for cause of LT Luster.

First Sergeant (1SG) Baker, who was not challenged, testified that he knew the following:

TC: Now, First Sergeant, have you ever heard anything about this case previously, for example, newspapers, radio, TV, or anything of that nature?

MEM(1SG BAKER): I've seen a brief, when I first got here three months ago, I witnessed a brief. They didn't go into details or anything. I didn't even know what was going on.

TC: Could you tell us briefly what you remember about what you saw?

MEM(1SG BAKER): I remember seeing the accused with some law enforcement officials and that's to my best recollection on that.

TC: And that's all you know about this case to this time?

MEM(1STSGT BAKER): That's all I know about it, sir.

TC: So, and you would not consider that in any way in determining the guilt or innocence of the accused?

MEM(1STSGT BAKER): No, sir. I believe in getting all the facts first, sir.

---

The last court member who had heard about the case was Gunnery Sergeant (GYSGT) Denoo, who was not challenged. His *voir dire* included the following:

ATC: Gunny, have you heard anything prior to this court regarding the circumstances of the case? Have you heard things on the radio, television, newspapers, talked to anyone else concerning the case?

MEM(GYSGT DENOO): I've heard talk around the area when I first checked in.

ATC: When did you first check in?

MEM(GYSGT DENOO): I checked in to the unit on April 28th of this year, sir.

ATC: And what talk did you hear?

MEM(GYSGT DENOO): Just that an incident took place. I did not know any names or any facts other than that, just that some kind of incident did take place.

ATC: Did you know what the incident was?.

MEM(GYSGT DENOO): It was supposed to have been a murder of a lieutenant and his wife.

ATC: Did anyone express any opinions or give any details of what happened?

MEM(GYSGT DENOO): No, sir.

ATC: Now, I assume, and I'll ask you, can you disregard what you've previously heard concerning the case and consider only the evidence that's presented in open court before you in making a decision?

MEM(GYSGT DENOO): Yes, sir, due to the nature you have to go on what evidence is presented.

ATC: Thank you. Gunny, did you know either of the victims, Lieutenant Lotz or Joan Lotz?

MEM(GYSGT DENOO): No, sir, I did not.

ATC: Gunny, right now I'm going to go through a long list of potential witnesses and after I read each name I'd like you to acknowledge yes or no if you recognize any of the names and think that you might know these people, and these are potential witnesses. The first is Miss Billie Jean Summerlin.

MEM(GYSGT DENOO): No.

ATC: Lieutenant J.B. Murry; he is the adjutant at 3/2?

MEM(GYSGT DENOO): No, sir.

ATC: Excuse me, the adjutant at H & S Company, 3/2?

MEM(GYSGT DENOO): No, sir.

ATC: Commander John Almeida, United States Navy?

MEM(GYSGT DENOO): No, sir.

---

The three junior enlisted members had heard nothing. Final Brief at 287. The defense rejected an option to challenge them. Additionally, the members who were exposed to pretrial publicity testified under oath that

they could make a decision based only on the evidence presented at trial.

▮▮▮ Appellant has the right to a fair and impartial jury. *See Chandler v. Florida*, 449 U.S. at 574, 101 S.Ct. at 809 ("Any criminal case that generates a great deal of publicity presents some risks that the publicity may compromise the right of the defendant to a fair trial."). A fair trial requires "jurors who will conscientiously apply the law and find the facts." *Wainwright v. Witt*, 469 U.S. at 423, 105 S.Ct. at 852. The basic theory underlying the right to an impartial jury is that the evaluation of the jurors should be based upon the evidence and not upon prejudgment that may occur as a result of pretrial publicity. *See Reynolds v. United States*, 98 U.S. 145, 154–57, 25 L.Ed. 244 (1878). This right applies in every criminal case "regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." *Groppi v. Wisconsin*, 400 U.S. 505, 509, 91 S.Ct. 490, 492, 27 L.Ed.2d 571 (1971) ("In the ultimate analysis, only the jury can strip a man of his liberty or his life[,]" quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).).

▮▮▮ Whenever the circumstances surrounding a jury trial threaten to "undermine the fairness of the factfinding process" by allowing the influence of prejudgment to dilute "the principle that guilt is to be established by probative evidence and beyond a reasonable doubt ... the probability of deleterious effects on fundamental rights calls for close judicial scrutiny." *Estelle v. Williams*, 425 U.S. 501, 503–04, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976). But adverse pretrial publicity does not in and of itself "lead to an unfair trial." *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554–55, 96 S.Ct. 2791, 2800–01, 49 L.Ed.2d 683 (1976) ("The trial judge has a major responsibility ... to mitigate the effects of pretrial publicity.").

▮▮▮ There are two types of prejudice that might impact on the right to a fair trial: first, presumed prejudice; and second, actual prejudice. There is a presumption of preju-

dice when appellant establishes that the pretrial publicity is prejudicial and inflammatory and has saturated the community. *Nebraska Press Assn. v. Stuart*, 427 U.S. at 554, 96 S.Ct. at 2800–01. To establish saturation, "there must be evidence of the amount of pretrial publicity and the number of individuals exposed to it." *United States v. Gray*, 37 MJ 730, 747 (ACMR 1992).

▮▮▮ The second type of prejudice is actual prejudice. *See Irvin v. Dowd*, 366 U.S. at 721–28, 81 S.Ct. at 1641–46. A conviction should not be overturned because of pretrial publicity unless there is a manifest injustice. *Mu'Min v. Virginia*, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). In *Mu'Min* the Court rejected the provision in the ABA Standards for Criminal Justice that a potential juror is subject to a challenge for cause "without regard to his state of mind, if he has been exposed to and remembers 'highly significant information' or 'other incriminating matters that may be inadmissible in evidence.'" The Court recognized "the constitutional standard" as being "'not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant'.... 'It is not required ... that the jurors be totally ignorant of the facts and issues involved.'" 500 U.S. at 430, 111 S.Ct. at 1908. In that case the Chief Justice, writing for the majority, concluded that it was not necessary that each juror be individually questioned as to the pretrial publicity. 500 U.S. at 431, 111 S.Ct. at 1908.

Concurring, Justice O'Connor recognized that even jurors who had read about inadmissible confessions were not "disqualified as a matter of law," but it is up to the trial judge to realistically assess whether the jurors could be impartial. 500 U.S. at 432, 111 S.Ct. at 1909; *see also Patton v. Yount*, 467 U.S. 1025, 1029, 104 S.Ct. 2885, 2887–88, 81 L.Ed.2d 847 (1984); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

■ This is not a case where the judge refused to allow inquiry, *see United States v. Gray,* 788 F.2d 1031 (4th Cir.1986), but as can be seen, there was an extensive inquiry. Furthermore, this inquiry did not reveal that a "racially charged atmosphere," Final Brief at 289, had permeated the courtroom. An inquiry establishing pretrial publicity is not enough. The defense must show not only that there was pretrial publicity but also that it had a prejudicial impact on the proceedings. This does not mean the jurors must be completely ignorant of the case. *See Irvin v. Dowd,* 366 U.S. at 722, 81 S.Ct. at 1642. But they may not have "fixed opinions" that would affect their impartiality. *Patton v. Yount,* 467 U.S. at 1035, 104 S.Ct. at 2890–91; *Sheppard v. Maxwell,* 384 U.S. at 362, 86 S.Ct. at 1522 ("Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused."). In this case, as can be seen from the extensive *voir dire,* no prejudice has been shown to appellant.

We hold that appellant was not prejudiced by any pretrial publicity surrounding the proceedings.

### ISSUE XXIV

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN ADMITTING PROSECUTION EXHIBIT 1, A COLOR WEDDING PHOTOGRAPH OF THE VICTIMS, BECAUSE THE PHOTOGRAPH SERVED NO PROBATIVE PURPOSE WHATSOEVER, IMPERMISSIBLY INFLAMED THE MEMBERS, AND IRREPARABLY PREJUDICED APPELLANT'S TRIAL, ESPECIALLY WITH REGARD TO SENTENCING, WHERE ADMISSION OF THE PHOTOGRAPH CAUSED THE COURT MEMBERS TO IMPOSE THE DEATH PENALTY IN VIOLATION OF THE EIGHTH AMENDMENT.

■ Appellant did not object to admission of the wedding photograph at trial.[9] In the absence of plain error appellant has waived this issue. Mil.R.Evid. 103. As explained in *United States v. Olano,* 507 U.S. at 732–36, 113 S.Ct. at 1777–78, 123 L.Ed.2d 508, to establish plain error appellant must demonstrate: (1) that there was error; (2) that such error was plain, clear, or obvious; and (3) that the error affected substantial rights. Under the third prong of *Olano,* "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." 507 U.S. at 734, 113 S.Ct. at 1778. The wedding photo (pros.ex. 1) shows what the victims looked like in comparison to the homicide exhibits (pros.ex. 3, 4, and 13). Victims of a murder are not faceless individuals. We see the effect of the before and after photographs. Also, it gives the members some indication of the size of the victims in comparison to the size of appellant as to the arguments concerning self-defense and type of manslaughter (Issues XXXVIII and XXXIX). Thus, the judge did not abuse his discretion in admitting pros.ex. 1.

### ISSUE XXV

WHETHER THE MILITARY JUDGE ERRED IN HIS HOLDING THAT THE PROBATIVE VALUE OF PROSECUTION EXHIBITS 3, 4, AND 13, PHOTOGRAPHS OF THE VICTIMS, OUTWEIGHED THEIR PREJUDICIAL EFFECT IN LIGHT OF THE INFLAMMATORY NATURE OF THE PHOTOGRAPHS AND THEIR MINIMAL UTILITY IN THE GOVERNMENT'S CASE IN CHIEF.

---

9. Appellate Exhibit XXX is a motion for appropriate relief. The exhibits which were the subject of this motion were initially labeled App. Ex. XIX, XX, XXI, and XXII. They were later introduced as prosecution exhibits 12, 13, 3, and 4, respectively. The defense stated it did not object to App. Ex. XIX (pros.ex. 12), XXI (pros.ex. 3), or XXII (pros.ex. 4). The only objection was to exhibit XX (pros.ex. 13). (R. 315.) There was no objection to pros. ex. 1. (R. 362.)

Issue XXV concerns application of Mil. R.Evid. 401–403. Mil.R.Evid. 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Mil.R.Evid. 402 provides: "All relevant evidence is admissible," with certain exceptions not applicable here. "Evidence which is not relevant is not admissible."

Even if the evidence is logically relevant under Mil.R.Evid. 401, it "may be excluded" under Mil.R.Evid. 403 "if its probative value is substantially outweighed" by the potential for prejudice.

Appellant argues that the three photographs of Mrs. Lotz should not have been admitted. However, like the prior issue, the defense raised no objection to pros. ex. 3 and 4. (R.315.) Thus, this issue centers on pros. ex. 13.

▬▬▬ The standard of review is whether the judge abused his discretion in admitting this exhibit. *United States v. White*, 23 MJ 84, 88 (CMA 1986).

The Government argues that "the photographs were relevant because (1) they identified the victims; (2) demonstrated the number of stab wounds and the cause of death; (3) provided the members with a sense of the physical surroundings at the crime scene; and (4) corroborated" appellant's statements. Answer at 175.

The defense counters by arguing that the photographs lacked probative value or in any event that the prejudice outweighed the probative value under Mil.R.Evid. 403. Final Brief at 317. In *United States v. Redmond*, 21 MJ 319, *cert. denied*, 476 U.S. 1105, 106 S.Ct. 1950, 90 L.Ed.2d 359 (1986), this Court upheld admission of the reconstructed skull of the victim. Chief Judge Everett stated that "we can hardly believe that the experienced officers who sat on the court-martial would have been significantly influenced by it." 21 MJ at 326. *See also United States v.*

*Thomas*, 6 USCMA 92, 98, 19 CMR 218, 224 (1955) (skull of homicide victim admitted to rebut accused's version of the crime).

We hold that the judge did not abuse his discretion in admitting pros.ex. 3, 4, and 13.

## ISSUE XXVI

WHETHER, ASSUMING ARGUENDO THAT HE DESIRED TO PLEAD GUILTY, RCM 1004'S PROHIBITION AGAINST GUILTY PLEAS IN CAPITAL CASES DEPRIVED APPELLANT OF A CRITICAL MITIGATING FACTOR AND CAUSED OTHER IRREPARABLE PREJUDICE.

This issue was resolved against appellant in *United States v. Loving*, 41 MJ at 292; *United States v. Dock*, 28 MJ 117 (CMA 1989); and *United States v. Matthews*, 16 MJ 354 (CMA 1983).

## ISSUE XXVII

WHETHER THE WARRANTLESS SEARCH AND SEIZURE OF APPELLANT'S CLOTHING BY THE ONSLOW COUNTY JAILOR WAS AN UNREASONABLE SEARCH AND SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT.

North Carolina State Trooper Danny F. Addison was called to the scene of an accident on U.S. Rt. 17 south the morning of April 14, 1987. When he arrived at the scene, he noticed a vehicle overturned on the left shoulder of the road. A woman pointed out appellant as the driver. Trooper Addison asked appellant for his driver's license and registration card. Appellant indicated that he did not have a driver's license, so they went to the patrol car. Trooper Addison testified about the ensuing conversation, as follows:

Q. What happened after the accused got in your car, Trooper?

A. I got in the car with him, asked him his name and date of birth, asked him what state he had his driver's license in and he told me Kansas. I called Wilmington on

my radio to call in a driver's license check in the state of Kansas. I asked about his registration card, whose car he was driving and he said, "It's my Lieutenant's."

Q. Did you detect anything when he was seated in the car with you, Trooper Addison?

A. Yes, I did.

Q. What was that?

A. I detected alcohol on his breath.

Q. And you stated that you asked him for his registration and then you asked about the registration of the car. Can you tell the court members what happened after he did that, Trooper?

A. After I asked him for the registration, he stated that it was his Lieutenant's car. I asked, "Does the Lieutenant know his car has been wrecked?" He said, "No, and he won't know." I said, "What do you mean?" He said, "Because he's dead." I said, "Okay." I called in a license check on the license plates. I told him to keep his seat, I got out of my vehicle, walked up towards the car where the car had been overturned.

Q. What happened there? What did you observe as you walked up toward the car, Trooper Addison?

A. I seen what looked to be a black knife laid on the ground, like it was inside of a sheath.

Q. And where was that located in relation to the car, Trooper Addison?

A. As I can remember, it was laying, approximately, maybe three or four feet directly behind the car on the ground.

Q. And the car, you say, was overturned?

A. Yes, it was.

Q. What did you do after you observed the knife?

A. I walked back to my car, came back around, got inside my car. At that time the radio station was calling me back for my license plate check. They—it come back to Joan and Frank Lotz; and I state to him, "Is that the Lieutenant?" He said,

"Yes." He stated, "I killed them last night."

Q. What did you do at that point, Trooper?

A. At that time I asked him, "What do you mean?" He said, "Well, we just had some problems." I said, "Okay, just keep your seat," and I got out of my car again, walked back around to his side and asked him out of the car. He stood up, I said, "Curtis, I'm going to have [to] handcuff you." He said, "All right." I handcuffed him and put him back in the car. At that time I walked back around to the MP that was standing behind the car, and I told the MP, "I want you to check this address here on base. This fellow stated he had killed someone." He said, "All right, I will." I got back in my car and finished with my paperwork.

Q. Now, Trooper Addison, you say you finished with your paperwork. What paperwork are your talking about?

A. I finished—at the time I was issuing—writing him a citation, what I was going to charge him with and finishing the wreck report on my rough copy there at the scene.

Later Addison took appellant back to the police station where they administered a breathalyzer test. During the breathalyzer test, Addison "advised" appellant "of his *Miranda* Rights." Appellant waived his rights. R. 394–96. While taking appellant down to the Magistrate's Office, appellant again admitted that he was willing to waive his rights. R. 396.

Appellant was interrogated by MAJ Douglas Freeman, Chief of Detectives for the Onslow County Sheriff's Department. During the interrogation, appellant confessed to the murders of LT and Mrs. Lotz. After the interview, appellant was taken across the street to the jail where he was incarcerated. MAJ Freeman and LT Mallard noticed what appeared to be blood on appellant's clothing.

LT C.L. Mallard testified that on April 14, 1987, he booked appellant and took appellant's clothing. LT Mallard turned the cloth-

ing over to an agent of the Naval Investigative Service (NIS).

■ An exception to the warrant requirement is a search incident to an arrest. In *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973), the Supreme Court held that there may be "a full search" of an arrestee incident to "a lawful custodial arrest." *See Gustafson v. Florida,* 414 U.S. 260, 264, 94 S.Ct. 488, 491, 38 L.Ed.2d 456 (1973).

■ There are temporal and spatial limitations on a search incident to a lawful arrest. But the Supreme Court has held that even a substantial delay will not invalidate a search. As the Court stated in *United States v. Edwards,* 415 U.S. 800, 807, 94 S.Ct. 1234, 1239, 39 L.Ed.2d 771 (1974):

> [O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and the subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.

■ The delay in appellant's case was only for a short period of time versus the 10–hour delay in *Edwards,* 415 U.S. at 810, 94 S.Ct. at 1240. In *State v. Bible,* 175 Ariz. 549, 858 P.2d 1152, 1202 (1993), the Supreme Court of Arizona upheld the seizure and testing of defendant's clothing after he had been placed in confinement. The clothing in *Bible* was also seized because of the blood on his pants and boots.

This is not an instance of seizing clothing unconnected with appellant. The evidence was clearly relevant, and no motion was made because it simply was not meritorious. *See, e.g., United States v. Loving,* 41 MJ at 244–45.

We hold that there was no violation of the Fourth Amendment in seizing appellant's clothing.

## ISSUE XXVIII

WHETHER APPELLANT'S INITIAL STATEMENTS TO THE NORTH CAROLINA AUTHORITIES ARE INADMISSIBLE BECAUSE HE WAS NOT PROPERLY ADVISED OF HIS RIGHTS UNDER *MIRANDA* OR ARTICLE 31(b).

## ISSUE XXIX

WHETHER APPELLANT'S CONFESSIONS WERE INADMISSIBLE BECAUSE THEY WERE TAINTED BY THE PRIOR STATEMENTS TO TROOPER ADDISON; THEY WERE INVOLUNTARY; AND BECAUSE IMPROPER CLEANSING WARNINGS WERE GIVEN.

The defense argues that at the time appellant was apprehended, he was a suspect, so a *Miranda* warning should have been given immediately. They argue that failure to do so requires suppression of all of appellant's statements. Appellate defense counsel does admit that "trial defense counsel failed to litigate this" issue even though they had indicated at the Article 32, UCMJ, 10 USC § 832, hearing that they would "contest a portion" of these statements. Final Brief at 321–22.

The Government argues that failure to raise these issues at trial constitutes waiver, citing RCM 905(e); Mil.R.Evid. 103 and 304(d)(2); *United States v. Miller,* 31 MJ 247 (CMA 1990). Answer at 182.

As Chief Justice Warren declared in *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612–13, 16 L.Ed.2d 694 (1966):

> Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated

by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right to silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

(Footnote omitted.)

The facts concerning the statements made by appellant are set forth in the discussion of Issue XXVII.

The statements can be divided between those made prior to arriving at the stationhouse and those made after appellant arrived at the stationhouse. The issue as raised by Chief Justice Warren is whether appellant was "taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612.

The key question in this case is whether appellant was in custody at the scene of the

accident.[10] The philosophy behind *Miranda* was to neutralize the subtle coercion that takes place at stationhouse interrogations and thereby ensure that confessions are voluntary. Recent decisions of the Court, namely, *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), and *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), indicate that the curtailment-of-freedom-of-action test is being replaced by a formal-arrest standard to determine when warnings are required.

In *Berkemer* the Court held that traffic stops were non-custodial for *Miranda* purposes. Justice Marshall stated:

It must be acknowledged at the outset that a traffic stop significantly curtails the "freedom of action" of the driver and the passengers, if any, of the detained vehicle.... Partly for these reasons, we have long acknowledged that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 [99 S.Ct. 1391, 1396, 59 L.Ed.2d 660] (1979) (citations omitted).

However, we decline to accord talismanic power to the phrase in the *Miranda* opinion emphasized by respondent. Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated....

Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced "to speak where he would not otherwise do so freely," *Miranda v. Arizona*, 384 U.S., at 467 [86 S.Ct. at 1624]. First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief....

Second, circumstances associated with the typical traffic stop are not such that

**10.** Since this issue was not litigated at the trial level, we need not address the objective-subjec-

tive test. *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

the motorist feels completely at the mercy of the police. . . .

468 U.S. at 436–38, 104 S.Ct. at 3148–49.

In reaching this conclusion, *Berkemer* cites *Beheler* as authority for its result. In dictum the Court in *Beheler* had declared:

Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. . . .

463 U.S. at 1125, 103 S.Ct. at 3520, citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).

After Addison questioned him about the car registration, appellant volunteered the statement that his lieutenant would not know his car was wrecked. Addison said, "What do you mean?" Appellant replied, "Because he's dead." This statement by appellant was made before there had been a formal arrest. After observing the knife near the wrecked car and returning to the patrol car, and then hearing the names based on the license plate check, Addison asked: "Is that the lieutenant?" Appellant replied, "Yes, I killed them last night." Addison asked, "What do you mean?" Appellant replied, "Well, we just had some problems." Addison replied, "Okay, just keep your seat." Based on these answers, Addison then handcuffed appellant and did not question him further.

Then Addison returned to his car to finish writing a citation for the automobile accident. Appellant was not questioned again at the scene. After returning to the stationhouse, appellant was advised of his *Miranda* rights and waived them. R. 394–96.

■ In this case, the questioning at the police station followed a rights warning and waiver. Until appellant responded, "Yes, I killed them last night," this might have been described as an ordinary or routine traffic stop. As the Supreme Court has stated: "[T]he usual traffic stop is more analogous to a so-called '*Terry*' [*v. Ohio*, 392 U.S. 1, 88

S.Ct. 1868, 20 L.Ed.2d 889 (1968) ] stop; . . . than to a formal arrest." When there has been this type of stop, a police "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." 468 U.S. at 439, 104 S.Ct. at 3150. The temporary detention incident to an accident absent other circumstances is non-custodial. Thus, we hold that no rights' warnings were required at the scene of the accident.

## ISSUE XXX

WHETHER THERE IS INSUFFICIENT EVIDENCE THAT JOAN LOTZ WAS ALIVE AT THE TIME OF THE ALLEGED WRONGFUL TOUCHING TO ESTABLISH GUILT OF THE SEXUAL ASSAULT UNDER CHARGE [SIC] ADDITIONAL CHARGE II.

■ The defense argues that the only record as to appellant's reason for touching Joan Lotz was as follows: "I didn't have a reason for ripping off the panties. I was very angry." Final Brief at 331, quoting page 3 of appellant's written confession at 1203 hours on April 14, 1987.

Special Agent Irvin Butler of the NIS testified that appellant admitted to him that he (appellant) "rubbed his finger in her vaginal area." When asked why he did this to her, appellant responded, " Because she was a woman." (Emphasis added.) Thus, the inference is that appellant fondled Mrs. Lotz' vagina not because he was "very angry," as appellant urges, but because he saw Mrs. Lotz as a vulnerable sex object.

The evidence presented at trial established that appellant stabbed Mrs. Lotz eight times: once in the shoulder, three times in the back of the head, once in the neck, and three times in the back. Commander John L. Almeida, Jr., MC, U.S. Navy, an expert in pathology, testified that "the cause of [Mrs. Lotz'] death . . . was a stab wound to the left back which entered the heart." CDR Almeida also stated that it was possible to calculate how long an individual would live "after a fatal wound

is received." These calculations are based on "the extent of the wound, the organ that was damaged, or the extent of damage to the body, and knowledge of physiology." CDR Almeida testified that he had personally examined Mrs. Lotz' wounds and calculated that she lived "a minimum of 2 minutes to a maximum of five" minutes after the fatal wound was inflicted in her left back.

Appellant argues that CDR Almeida could not determine the sequence of the wounds to Mrs. Lotz, and, therefore, the Government did not establish that she was alive when he indecently assaulted her. This argument falls woefully short, however, because the members had a wealth of information at their disposal in addition to the testimony of CDR Almeida. But appellant in his statement asserted, "I stabbed her in the chest. When she fell, I stabbed her in the back." Appellant also testified at trial on cross-examination that after he had finished stabbing Mrs. Lotz, he "grabbed her by the legs" and "pulled her toward" him. Appellant then related that, as he pulled Mrs. Lotz to him, *she said:* "Stop!" and "What have we ever done to you?" He then immediately "ripped off her panties" and rubbed his hand on her vaginal area. R. 562–63. Another witness had testified that in one of his statements appellant had said that he heard "noises coming from" Mrs. Lotz' body immediately after he had indecently assaulted her. R. 528. This point is crucial when considered along with CDR Almeida's responses to the following questions:

Q: And, Doctor, one final question. What would the indication of non-verbal sounds coming from a body indicate with respect to the time of death, sir?

A: This would indicate to me that the victim was still making respiratory efforts, that is, still trying to breathe, and had not died at that time.

Q: So, are you saying if there's noise coming from the body it's an indication that the body's still alive, is that—

A: Yes.

Based on these facts taken in the light most favorable to the Government, we hold that it was reasonable for the members to have found beyond a reasonable doubt that Mrs. Lotz was indeed alive while appellant indecently assaulted her. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

## ISSUE XXXI

WHETHER THE LOWER COURT ERRED IN AFFIRMING A FINDING THAT THE GOVERNMENT PROVED BEYOND A REASONABLE DOUBT THAT APPELLANT KILLED JOAN LOTZ WITH PREMEDITATION.

The defense argues that the Government has not proved beyond a reasonable doubt a premeditated design to kill or an intent to kill Mrs. Lotz. All the facts "indicate a killing out of impulse rather than advance contemplation." Final Brief at 341. Appellant "was surprised" to learn that Mrs. Lotz was at home. Final Brief at 342. Appellant testified that, even when LT Lotz called his wife's name, appellant did not know whether she was there. Even the "seven to eight rapidly inflicted stab wounds are indicative of impulsive, panicstricken blows someone would strike in surprise." Final Brief at 345.

The elements of the offenses in Article 118(1) and (2) are as follows:

*(1) Premeditated murder*

(a) That a certain named or described person is dead;

(b) That the death resulted from the act or omission of the accused;

(c) That the killing was unlawful; and

(d) That, at the time of the killing, the accused had a premeditated design to kill.

*(2) Intent to kill or inflict great bodily harm.*

(a) That a certain named or described person is dead;

(b) That the death resulted from the act or omission of the accused;

(c) That the killing was unlawful; and

(d) That, at the time of the killing, the accused had the intent to kill or inflict great bodily harm upon a person.

Para. 43(b), Part IV, Manual, *supra.*

In defining the premeditated design to kill, paragraph 43c(2)(a) provides:

A murder is not premeditated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended. It is not necessary that the intention to kill have been entertained for any particular or considerable length of time. When a fixed purpose to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution. The existence of premeditation may be inferred from the circumstances.

■ Only certain offenses are death-qualifying. This reflects society's interests in reserving the death penalty only for a certain subclass of offenses. There is a critical distinction between a premeditated design to kill and an intent to kill. The death penalty is only authorized when there is "a premeditated design to kill." Art. 118(1). Although both a premeditated design to kill and an intent to kill require an examination of appellant's mental state at the time of the offense, there is a difference. One of the most difficult situations is distinguishing between the two when there is only a short period of time that has elapsed. The Manual states: "It is not necessary that the intention to kill have been entertained for any particular or considerable length of time." Para. 43c(2)(a).

■ For years courts have wrestled with the difference between first and second-degree murder. As then-Chief Judge Cardozo recognized:

There can be no intent unless there is a choice, yet ... the choice without more is enough to justify the inference that the intent was deliberate and premeditated. The presence of a sudden impulse is set to mark the dividing line, but how can an impulse be anything but sudden when the time for its formation is measured by the lapse of seconds? Yet the decisions are to the effect that seconds may be enough ... The present distinction is so obscure that no jury hearing it for the first time can fairly be expected to assimilate and understand it. I am not at all sure that I understand it myself after trying to apply it for many years and after diligent study of what has been written in the books. Upon the basis of this fine distinction with its obscure and mystifying phraseology, scores of men have gone to their death.

Cardozo, *"What Medicine Can Do for the Law,"* reprinted in *Law and Literature* 70, 96–101 (1931), *quoted in United States v. Chagra,* 638 F.Supp. 1389, 1399–1400 (W.D.Tex.1986). The element of premeditated design includes both the "specific intent to kill someone and consideration of the act intended." Thus, "the killing must have been committed after reflection by a cool mind." *See United States v. Hoskins,* 36 MJ 343, 346 (CMA 1993). The premeditation may not be inferred "from the mere fact of killing." *People of the Territory of Guam v. Atoigue,* 508 F.2d 680, 681 (9th Cir.1974).

Appellant knew that LT Lotz was married and lived with his wife. Appellant had been to the Lotz' home prior to the murders and personally observed Mrs. Lotz there. During the evening of April 13, 1987, appellant decided to kill LT Lotz, broke into the supply room and stole a knife, retrieved a pair of rubber gloves, stole a bike for transportation to the Lotz' home, checked out the home by peering in the windows, and used a ruse to gain entry into the house. Appellant was asked what he was thinking when he stabbed Mrs. Lotz. He replied: "That she was part of—she was part of Mr. Lotz, part of LT Lotz." Appellant also stated that he "went through" the rest of the rooms in the house "to make sure" that if anyone was there who would serve as a witness, he "would kill them too." He confirmed this on cross-examination, as follows:

Q. And you went through that house and if anyone else would have been alive,

you would have killed them, too, isn't that true?

A. Yes, sir.

Q. If anyone else would have been alive, you would have killed them. What is your answer to that, please?

A. Yes.

Mrs. Lotz was stabbed eight times: once in the shoulder, three times in the back of the head, once in the neck, and three times in the back. The fatal wound was to the left back when the knife entered the heart. This stabbing took place while Mrs. Lotz pleaded for her life.

In prosecution exhibit 36, appellant states that LT Lotz' "wife was there immediately. She got near the telephone. She was within reach of me. I stabbed her in the chest. When she fell, I stabbed her in the back." Special Agent Butler of the NIS testified that appellant told him that Lotz called out for his wife and "she ran into the room" to help him. After trying to help her husband, she turned to appellant and kicked him in the leg.

Appellant testified during cross-examination that he stabbed Mrs. Lotz only after she kicked at him. He stated:

Q: Well, why would he call for his wife if she wasn't in the house?

A: I don't know, sir.

Q: You don't know. And then Mrs. Lotz came rushing into the room with a blanket on to try to help her husband, didn't she?

A: Yes, sir.

Q: And she went first to her husband, right?

A: Right, sir.

Q: As he lay dying on the floor, is that correct?

A: That's correct, sir.

Q: And then she turned around to face you and she called out your name because she knew you, isn't that true?

A: I don't know if that was exactly what happened, sir.

Q: You don't know if that was the exact thing that happened? But she——

A: She kicked me, sir.

Q: She kicked you, but she called your name, isn't that right?

A. Somewhere in that time.

Q: She kicked you with her bare feet?

A: True, sir.

Q: Her bare feet. And then you stabbed her, right?

A. Correct, sir.

Q: And how many times did you stab her?

A: I don't know, sir.

Q: You don't know. There are eight wounds in Mrs. Lotz. You've seen the evidence, have you not, in this court?

A: Have I seen the evidence, the pictures?

Q: Yes.

A: No, I haven't seen the pictures.

Q: You heard Doctor Almeida, the pathologist, testify there were eight wounds, did you not?

A: I believe so, sir.

Q: You believe so. But Mrs. Lotz knew you, didn't she?

A: Yes, sir.

Q: And then Mrs. Lotz, you grabbed her by the legs, right, and you pulled her toward you?

A: Yes, sir.

Q: And Mrs. Lotz kept saying, "Stop," and she kept saying, "What have we ever done to you?" Didn't she say that?

A: Yes, sir.

 Our standard for review in testing the legal sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789. We hold that the *Jackson* standard was met. Appellant was not surprised or blindsided; he knew LT Lotz was married and lived with his wife. Appellant implicitly admitted that the premeditated design to kill LT Lotz also applied to Mrs. Lotz in that he saw them as one.

Even after her husband was dead and appellant could see that Mrs. Lotz was no threat, he inflicted a fatal "stab wound to the left back which entered the heart." Even after he stabbed her, he "pulled" her bleeding body towards him and indecently assaulted her.

## ISSUE XXXII

WHETHER THE MILITARY JUDGE ERRED IN INSTRUCTING ON FINDINGS AND SENTENCING THAT REASONABLE DOUBT MEANT PROOF TO MORAL CERTAINTY RATHER THAN EVIDENTIARY CERTAINTY AS REQUIRED BY *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).

This issue was resolved against appellant in *United States v. Loving,* 41 MJ at 281; *United States v. Meeks,* 41 MJ 150, 155–57 (CMA 1994).

## ISSUE XXXIII

WHETHER THE LOWER COURT ERRED IN AFFIRMING A FINDING OF GUILT AS TO ADDITIONAL CHARGE I WHEN THE VALUE OF THE BICYCLE WAS PROVEN TO BE LESS THAN THE CHARGED VALUE OF $156.70, PURSUANT TO THE OWNER'S TESTIMONY THAT THE BIKE WAS ONLY VALUED AT APPROXIMATELY $75.00.

We accept the Government's concession that the value of the bike should be reduced to $75.00, but hold that the error was harmless.

## ISSUE XXXIV

WHETHER THE LOWER COURT ERRED IN AFFIRMING APPELLANT'S CONVICTION BECAUSE IT FAILED TO CONSIDER THE DEFENSE OF DIMINISHED CAPACITY ESTABLISHED IN *Ellis v. Jacob,* 26 MJ 90 (CMA 1988).

The defense argues that there was "ample evidence—from government witnesses to support" a theory of diminished responsibility. The defense refers to the testimony of Dr. Phillips that appellant manifested "acute depersonalization." Thus, to support the theory of diminished capacity, the defense then refers to the testimony of NIS Agent Butler at the investigation under Article 32, UCMJ, 10 USC § 832, that "appellant was in a dissociative state at the time of the killings." Final Brief at 358. At the time of appellant's offenses, the definition of lack of mental responsibility read as follows:

> (a) It is an affirmative defense in a trial by court-martial that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of the acts. Mental disease or defect does not otherwise constitute a defense.

Art. 50a, UCMJ, 10 USC § 850a. This standard was reflected at the time of the offenses in RCM 916(k)(1) (Change 3), effective Nov. 14, 1986. *See* Exec. Order No. 12,586, §§ 1(i) & 5b, 52 Fed.Reg. 7105, 7112. As to partial mental responsibility, the Manual stated:

> A mental condition not amounting to a lack of mental responsibility under subsection (k)(1) of this rule is not a defense, nor is evidence of such a mental condition admissible as to whether the accused entertained a state of mind necessary to be proven as an element of the offense.

RCM 916(k)(2). These sections would appear to preclude the defense of diminished *mens rea*—either the accused had a complete defense of lack of mental responsibility or he did not.

In 1988, however, this Court, in the landmark diminished *mens rea* case of *Ellis v. Jacob,* 26 MJ 90 (1988), stated that such an "all or nothing" set of options "raises obvious constitutional concerns" if RCM 916 was construed to keep the accused from attacking the *mens rea* element directly. *Id.* at 92. In *Ellis,* the accused—charged with the unpremeditated murder of his son—moved *in limine* to establish admissibility of expert

testimony as to "his state of mind at the time of the" killing. Ellis claimed that the evidence would show that he had no specific intent to kill. The evidence was not based on a lack of mental responsibility, however, but simply on the theory of diminished *mens rea* "due to extreme sleep deprivation and other pressures" in Ellis' life. *Id.* at 91.

 *Ellis* is distinguishable. The facts presented by the defense and even Dr. Phillips' testimony did not raise the issue of diminished *mens rea.* Second, the judge adequately instructed the members as to the specific intent involved in each of the crimes charged. Third, the defense made no request for a diminished *mens rea* instruction.

Because the testimony of Special Agent Butler was never introduced at trial to be considered with the testimony of Dr. Phillips, we hold that the Court of Military Review did not err in failing to consider the defense of diminished *mens rea.*

### ISSUE XXXV

WHETHER THE DESIGNATION OF THE SENIOR MEMBER AS THE PRESIDING OFFICER FOR DELIBERATIONS DENIED APPELLANT DUE PROCESS OF LAW AND A FAIR AND IMPARTIAL MEMBERS' CONSIDERATION OF THE EVIDENCE, BY ESTABLISHING THE SENIOR MEMBER'S SUPERIORITY IN AND CONTROL OF THE DELIBERATION PROCESS.

 Appellant makes a legal argument without any factual predicate that RCM 502(b)(1), designating the senior member as president of the panel, somehow violates due process of law. This argument overlooks the deference to be accorded the system set up by Congress and the President as recognized in *Weiss v. United States,* 510 U.S. 163, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994). It also ignores the standard instruction on findings and sentence that "influence of superiority in rank will not be employed in any manner in an attempt to control the independence of

members in the exercise of their own personal judgment." R. 740 and 827.

Based upon our analysis of Issues XIV thru XXIII and the deference given to Congress in regulating the armed forces, we hold that designating the senior member does not deprive appellant of a fair and impartial trial.

### ISSUE XXXVI

WHETHER THE MILITARY JUDGE FAILED TO PROPERLY INSTRUCT THE MEMBERS REGARDING THE LAW OF A CAPITAL CASE AND THE CAPITAL SENTENCING MECHANISM OF RCM 1004 and 1006, WHEN THE JUDGE FAILED TO INFORM THE MEMBERS OF THESE MATTERS IN PRELIMINARY INSTRUCTIONS AND FIRST EXPLAINED THEM AFTER COUNSEL'S SENTENCING ARGUMENT.

 The military judge gave the standard preliminary instructions. There was no request by the defense for preliminary instructions on capital sentencing procedures, and in any event, the judge is not required to give preliminary instructions as to those procedures. RCM 913 and 1005. We note that during his *voir dire,* defense counsel mentioned some of the procedures involved in capital sentencing. In our opinion the absence of preliminary instructions on those procedures does not constitute error.

### ISSUE XXXVII

WHETHER THE RECORD IS INCOMPLETE WHERE A CRITICAL PORTION OF THE PROCEEDINGS (DISCUSSION AND ARGUMENT ON INSTRUCTIONS ON FINDINGS) WAS CONDUCTED IN A SUNDAY AFTERNOON RCM 802 CONFERENCE OFF THE RECORD, ESPECIALLY WHERE THERE IS NO INDICATION THAT APPELLANT WAS PRESENT.

The defense argues that the notation in the record (R. 808) that proposed sentencing instructions were discussed at a pretrial *conference* [11] under RCM 802 violates appellant's

11. *See United States v. Sadler,* 29 MJ 370, 373 n. 3 (CMA 1990). This trial was held in 1987.

rights. The defense further argues that there is a violation of appellant's rights because the conference at which the sequence of arguments was discussed was not part of the record.[12]

Since appellant's trial was held prior to July 6, 1991, RCM 802 conferences could not be held over the objection of a party. Now they can be so held. RCM 802(c). Exec. Order No. 12,767, § 1(h), 56 Fed.Reg. 30292, 30299. Fed.R.Crim.P. 17.1 authorizes these pretrial conferences in the absence of the accused. RCM 802(d) indicates that it is optional whether appellant attends. In any event, RCM 802(b) provides:

> Conferences need not be made part of the record, but matters agreed upon at a conference shall be included in the record orally or in writing. Failure of a party to object at trial to failure to comply with this subsection shall waive this requirement.

■ We hold that in the absence of any objection by the parties on the record, there is a waiver. This rule comports with the Federal rule and normal trial procedures in the United States concerning pretrial conferences.

## ISSUE XXXVIII

WHETHER A MANSLAUGHTER INSTRUCTION MUST INCORPORATE THE SUBJECTIVE BELIEF RATHER THAN THE OBJECTIVE BELIEF OF A REASONABLE PERSON.

■ At an RCM 802 conference on August 2, 1987, the parties agreed that the judge would give the Federal jury practice instruction 41.14 on voluntary manslaughter. After the agreed-upon instruction was given, defense counsel specifically stated that there was no objection to the instructions. In addition to waiver, there was no error in this case. A reasonable person is judged by an objective standard, not a subjective one as

argued by appellant. Additionally, these instructions are similar to those in paragraph 3–86, Military Judge's Benchbook at 3–171 note 2 (Change 2) (1986), and were given pursuant to paragraph 44c(1), Part IV, Manual, *supra.* *McKinney v. Israel,* 740 F.2d 491, 495 (7th Cir.1984) ("Testimony on appellant's subjective anger and passion would not have been relevant due to the lack of evidence of objectively adequate provocation.") supports the validity of the instruction given. It clearly does not support the defense assertion.

We hold that the manslaughter instruction was sufficient.

## ISSUE XXXIX

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO *SUA SPONTE* INSTRUCT THE MEMBERS ON VOLUNTARY MANSLAUGHTER AND ERRONEOUSLY LIMITED THE MEMBERS' CONSIDERATION TO ONLY PREMEDITATED AND UNPREMEDITATED MURDER WITH REGARD TO THE KILLING OF JOAN LOTZ.

■ The defense argues that the lesser-included-offense instruction on voluntary manslaughter with regard to the killing of Mrs. Lotz should have been given based on a theory of transferred rage. Final Brief at 375. However, we hold that this instruction was not required. Voluntary manslaughter involves an unlawful killing "with an intent to kill or inflict great bodily harm" but committed "in the heat of sudden passion caused by adequate provocation." Art. 119(a); para. 44c(1)(a), Part IV. "The provocation must be adequate to excite uncontrollable passion in a reasonable person...." Para. 44c(1)(b). In this instance there was no adequate provocation by Joan Lotz, and a transfer of the rage would not be adequate provocation.

---

12. We also note that the "propriety of a proposed area of inquiry by *voir dire* was" discussed in an RCM 802 conference and that the defense "indicated that they would not pursue this particular area." This summary was accepted by defense counsel. (R. 10.) However, there is no indication what the "area" was that the defense chose to avoid. Besides, this is not the type of matter which should be discussed at an RCM 802 conference. It should be on the record.

We hold that there was no error. *See* Issues XXIV and XXV.

### ISSUE XL

WHETHER THE MILITARY JUDGE'S INSTRUCTION ON BURGLARY WAS INCOMPLETE AND PREJUDICIAL TO APPELLANT WHERE THE INSTRUCTION FAILED TO INFORM MEMBERS THAT THE BURGLARY OFFENSE COULD BE SUPPORTED BY THE FELONY OF MANSLAUGHTER.

The military judge instructed that the underlying felony for the burglary in Charge III was murder, either premeditated or unpremeditated, under Article 118. The defense argues that another underlying felony for burglary would include manslaughter under Article 119. Thus, the defense contends that since the judge instructed on burglary, he should have given a voluntary-manslaughter instruction with regard to the killing of LT Lotz.

■■ We hold that appellant was not prejudiced because appropriate instructions were given on premeditated and unpremeditated murder. Additionally, the only error by the judge was giving an instruction on voluntary manslaughter even though not raised by the evidence. *See* Issue XXXIX; *United States v. Waldron,* 11 MJ 36 (CMA 1981).

### ISSUE XLI

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO PROVIDE A *SUA SPONTE* INSTRUCTION THAT VOLUNTARY INTOXICATION IS A DEFENSE TO THE SPECIFIC INTENT ELEMENT OF UNPREMEDITATED MURDER. *But see United States v. Morgan,* 37 MJ 407 (CMA 1993).

■■ We hold that no instruction was required on voluntary intoxication based upon the strategic decisions of counsel. *See* Issue I.

### ISSUE XLII

WHETHER THE MILITARY JUDGE'S INSTRUCTION ON PREMEDITATED MURDER AS "MURDER COMMITTED AFTER FORMATION OF A SPECIFIC INTENT TO KILL SOMEONE AND CONSIDERATION OF THE ACTION INTENDED" DID NOT SUFFICIENTLY ADVISE THE MEMBERS OF THE *MALICE* ASPECT OF PREMEDITATION AND DID NOT PERMIT AN INFORMED MEMBER TO EVALUATE THE APPELLANT'S *MENS REA* AT THE TIME OF THE OFFENSES.

This is another issue that was not raised at trial. The defense cites for this proposition *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *Godfrey* held that the statute defining when murder was "outrageously or wantonly vile, horrible or inhuman" was too vague. In *Furman,* the Court set forth the standards that should be used for sentencing as to aggravating and mitigating circumstances.

This issue was resolved against appellant in *United States v. Loving,* 41 MJ at 280. *See also United States v. Teeter,* 16 MJ 68, 71–72 (CMA 1983).

### ISSUE XLIII

WHETHER THE MILITARY JUDGE'S INSTRUCTIONS RESTRICTED FREE CONSIDERATION OF THE EVIDENCE BY REQUIRING THE MEMBERS TO VOTE ON THE MOST SERIOUS OFFENSE FIRST.

The defense argues that the military judge erred when he did not grant the defense request to require the members "to focus on the lesser included offenses before considering the greater offenses." RCM 921(c)(5) requires that the members "not vote on a lesser-included offense unless a finding of not guilty of the offense charged has been reached." The judge complied with this requirement. R. 740. The defense argues that this requires members to focus on the great-

er offense before the lesser-included offenses.

■ But the instruction on the voting procedures does not limit the discussion on all offenses and defenses by the members. Thus, the members could discuss the lesser-included offenses in any manner they saw fit. The judge never instructed the members as to when and where the discussion should begin. Instead, he instructed them that there should be "full and free discussion." R. 740. Therefore, we hold the judge correctly instructed the members on voting.

## ISSUE XLIV

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO GIVE AN IN-STRUCTION ON SELF–DEFENSE RE-GARDING APPELLANT'S KILLING OF MRS. LOTZ SINCE SHE WAS STABBED AFTER SHE HAD AT-TACKED APPELLANT; THE LAW ERRS ON THE SIDE OF APPELLANT IN RESOLVING ANY DOUBT AS TO WHETHER TO REQUIRE AN IN-STRUCTION.

RCM 916(e)(1) defines self-defense as follows:

*Homicide or assault cases involving deadly force.*

It is a defense to a homicide, assault involving deadly force, or battery involving deadly force that the accused:

(A) Apprehended, on reasonable grounds, that death or grievous bodily harm was about to be inflicted wrongfully on the accused; and

(B) Believed that the force the accused used was necessary for protection against death or grievous bodily harm.

■ Self-defense is a defense of necessity. If an accused uses force in excess of that believed by him or her to be necessary for defense, he or she becomes the aggressor and is not entitled to this defense. *United States v. Reid,* 32 MJ 146, 148 (CMA 1991); *United States v. Richey,* 20 MJ 251, 252

(CMA 1985). Such is the evidence here. Additionally, "[t]he right of self-defense is lost ... if the accused was an aggressor ... or provoked the attack which gave rise to the apprehension." RCM 916(e)(4). RCM 916(e)(1) is based upon *United States v. Jackson,* 15 USCMA 603, 36 CMR 101 (1966). *See Manual, supra* at A21–60. In *Jackson,* the accused had been harassed by his victim. The victim struck the accused with an open hand; then the victim and the accused struggled for about 4 minutes. The accused then pulled out a knife and stabbed the victim three times, one of these being the fatal blow. This Court defined the requirement for the defense of self-defense as follows:

[Self-]defense is composed of two elements. First, the surrounding circumstances must show the existence of reasonable grounds to apprehend that death or grievous bodily harm is likely to be inflicted upon the accused; and secondly, it must appear the accused believes the force he used against another, that is, the force which is the basis of the charge against him, was necessary to protect himself against death or serious bodily harm.

15 USCMA at 608, 36 CMR at 106. This Court further held:

Consequently, in determining the existence of reasonable grounds to anticipate danger, certain factors relating to the accused are considered. For example, to a child or a female a particular situation may present reasonable grounds to apprehend danger, but the same circumstances may not make an adult male apprehensive of death or serious injury....

*Id.* This Court held that the first element of the test to be used was "whether, considering all the circumstances, a reasonable, prudent person would believe there was ground to fear death or grievous bodily harm.... This aspect of the defense ... is objective in nature." *Id.* On the other hand, the second element is personal to the accused. This means: "His inexperience, his lack of education, his emotion control, all are relevant to whether he believed it was necessary for his

protection to use the degree of force he used." *Id.*

In the case now before this Court, the record clearly shows that appellant failed to establish either element of the self-defense requirement necessary to trigger an instruction. The evidence shows that appellant was the aggressor from the moment he entered the Lotz' home until he drove away in their car. The evidence further established that appellant is 6 feet 4 inches tall, and weighed, at the time of the murders, 185 pounds. Prosecution exhibit 1 reveals that Mrs. Lotz was considerably smaller than appellant. Next, appellant's first confession to NIS (pros.ex. 36), states: "His [LT Lotz'] wife was there immediately. She got near the telephone. She was within reach of me. I stabbed her in the chest. When she fell, I stabbed her in the back. She fell backwards into two chairs that were close together." Next, Agent Butler testified:

> What he said—when I asked him why did he kill her [Mrs. Lotz], he said that Lieutenant Lotz called her name, she ran into the room, she saw her husband, she first went to her husband and tried to help him, then she turned to the accused, ran up towards him, kicked him in the leg, and he started stabbing her.

Finally, appellant's own testimony reveals that he continued throughout this entire period to be the aggressor and that he did not fear for his safety in any respect. In responding to a question by his defense counsel about what he was thinking when he stabbed Mrs. Lotz, appellant replied: "That she was part of—she was part of Mr. Lotz, part of Lieutenant Lotz." The following line of questions and answers to trial counsel's cross-examination lays this issue to rest:

> Q: Well, why would he call for his wife if she wasn't in the house?
>
> A: I don't know, sir.
>
> Q: You don't know. And then Mrs. Lotz came rushing into the room with a blanket on to try to help her husband, didn't she?
>
> A: Yes, sir.

Q: And she went first to her husband, right?

A: Right, sir.

Q: As he lay dying on the floor, is that correct?

A: That's correct, sir.

Q: And then she turned around to face you and she called out your name because she knew you, isn't that true?

A: I don't know if that was exactly what happened, sir.

Q: You don't know if that was the exact thing that happened? But she—

A: She kicked me, sir.

Q: She kicked you, but she called your name, isn't that right?

A: Somewhere in that time.

Q: She kicked you with her bare feet.

A: True, sir.

Q: Her bare feet. And then you stabbed her, right?

A: Correct, sir.

Q: And how many times did you stab her?

A: I don't know, sir.

Q: You don't know. There are eight wounds in Mrs. Lotz. You've seen the evidence, have you not, in this court?

A: Have I seen the evidence, the pictures?

Q: Yes.

A: No, I haven't seen the pictures.

Q: You heard Doctor Almeida, the pathologist, testify there were eight wounds, did you not?

A: I believe so, sir.

Q: You believe so. But Mrs. Lotz knew you, didn't she?

A: Yes, sir.

Q: And then Mrs. Lotz, you grabbed her by the legs, right, and you pulled her toward you?

A: Yes, sir.

Q: And Mrs. Lotz kept saying, "Stop," and she kept saying, "What have we ever done to you?" Didn't she say that?

A: Yes, sir.

Q: She said that. She said, "What have we ever done to you?" How many times did she say that?

A: One, sir.

Q: Once. And then Mrs. Lotz as she— you pulled her toward her on the floor, you ripped off her panties, right?

A: Correct, sir.

Q: Okay. And you couldn't even rip them off, could you, because you had to use the K–Bar to get them off, didn't you?

A: I don't remember, sir.

Q: You don't remember. Did Mrs. Lotz ever do anything to you, in her life, to hurt you?

A: No. sir.

\* \* \*

Q: And then you stated you—on direct examination, you had to kill her because she was part of the Lieutenant, is that correct?

A: True, sir.

Appellant's contention that a self-defense instruction should have been given solely on the fact that this smaller woman kicked appellant first with her bare feet misinterprets the law. In *United States v. Rose*, 28 MJ 132 (1989), this Court decided that a self-defense instruction should have been given because: the accused "was struck first"; the accused "was retreating and attempting . . . to ward off the victim" by *"brandish[ing* ]" a bottle; and because the accused stated immediately after the fight that he had acted "in self-defense.". 28 MJ at 135.

Appellant's reliance (Final Brief at 391) on *United States v. Weinmann*, 37 MJ 724 (AFCMR 1993), *pet. denied*, 40 MJ 41 (1994), is also misplaced. Weinmann was convicted of aggravated assault by hitting his victim in the face with a beer bottle. The evidence showed that he argued with a civilian inside the enlisted club on base. They went outside where a crowd consisting largely of persons unfriendly to Weinmann encircled the two men. Several persons in the crowd hit Weinmann. While he and the civilian were fighting, Weinmann hit the civilian in the face with a beer bottle. 37 MJ at 725–26. Answer to Final Brief at 229.

The defense strategy at Weinmann's trial was not to raise a defense of self-defense but, instead, to argue that it was not the accused who hit the civilian in the face with the beer bottle. In fact, trial defense counsel affirmatively waived a self-defense instruction with respect to the aggravated-assault charge; therefore, the military judge gave no such instruction. The Air Force Court specifically found that the military judge erred in not giving the self-defense instruction because the *crowd* had thrown punches at the accused. Thus, the force necessary to defend oneself with a beer bottle from a crowd of people, as opposed to simply the one civilian combatant, did raise the issue of self-defense. 37 MJ at 726. Answer to Final Brief at 226–30.

Here, Curtis clearly was the aggressor from the moment he entered the Lotz' home. He never retreated from Mrs. Lotz' feeble kick. He did not merely brandish the K–Bar knife at Mrs. Lotz but, instead, brutally stabbed her eight times, seven of those blows in her back and back side of her head. Finally, appellant *never* told anyone that he stabbed Mrs. Lotz in self-defense. Instead, he said he killed her because she was "part of the lieutenant" and was a witness to his crime.

Given all of the above, there is absolutely no evidence from which a reasonable, prudent person would conclude that appellant had grounds to fear death or grievous bodily harm from Mrs. Lotz' single, barefooted kick. 15 USCMA at 608, 36 CMR at 106. Further, appellant's testimony and his confession establish that appellant did not believe it was necessary *for his protection* to stab Mrs. Lotz. The evidence clearly shows that appellant committed the premeditated murder of Mrs. Lotz because he perceived her to be part of the man he hated and because he had to kill every witness that was present in the Lotz house in order to cover his tracks. Finally, the force he repeatedly used against Mrs. Lotz, stabbing her over and over again,

mostly in her back and the back of her neck, was excessive by any stretch of the imagination and was never an act of necessity. 20 MJ at 252.

We hold that appellant has failed to demonstrate that the evidence reasonably raised the defense of self-defense. The military judge was not, therefore, required to give a self-defense instruction.

## ISSUE XLV

WHETHER IN A CAPITAL CASE WHERE APPELLANT'S NOT GUILTY PLEA WAS MANDATORY BY STATUTE, THE MILITARY JUDGE HAD A *SUA SPONTE* OBLIGATION TO INQUIRE WHETHER APPELLANT UNDERSTOOD UNEQUIVOCALLY THE CONSEQUENCES OF HIS TESTIMONY WHERE HE TESTIFIED IN RESPONSE TO HIS OWN COUNSEL THAT HE "DECIDED TO KILL" LT LOTZ.

 Defendant's testimony did not require an inquiry as to its consequences. This is unlike a request to the convening authority, *United States v. Dresen,* 40 MJ 462 (CMA 1994), or a request to the sentencing authority for a discharge, *see, e.g., United States v. Lyons,* 36 MJ 425 (CMA 1993). In this instance appellant testified consistently with the pretrial statements he had made, and the defense worked these statements into the strategy of their case as discussed in Issue I. Thus, we hold that there is no duty upon the judge to stop appellant's testimony to ensure there was a voluntary and intelligent waiver of his rights.

## ISSUE XLVI

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO GIVE A REQUESTED INSTRUCTION REGARDING MITIGATING FACTORS IN GENERAL AND IN FAILING TO EVEN MENTION ALCOHOL INTOXICATION IN PARTICULAR AS A MITIGATING FACTOR.

 The defense argues that failure to list alcohol as a mitigating factor was error. There was no objection to the instructions. In the absence of plain error appellant has waived this issue. Mil.R.Evid. 103; 44 MJ at 140. Failure to give an instruction listing voluntary intoxication as a mitigating factor was not a plain, clear, or obvious error. In fact, if the judge had given such an instruction, appellate defense counsel may well have argued that this undercut the defense theory of the case of LT Lotz' racial prejudice. *See* Issue I. Thus we hold that this Issue was waived in the absence of plain error. RCM 1005(f).

## ISSUE XLVII

WHETHER THE MILITARY JUDGE'S FAILURE TO INSTRUCT THE MEMBERS REGARDING THE BURDEN OF PROOF ON MITIGATING FACTORS WAS INADEQUATE GUIDANCE TO THEM IN THEIR DELIBERATIONS TO ENSURE A RELIABLE SENTENCING VERDICT.

This issue was resolved against appellant in *United States v. Loving,* 41 MJ at 276–79. *See also* Issue I(B)(7).

## ISSUE XLVIII

WHETHER TRIAL COUNSEL ENGAGED IN UNLAWFULLY INFLAMMATORY ARGUMENT BY DENIGRATING THE NATURE OF THE RACIAL ISSUES IN THIS CASE, ARGUING COMMAND POLICY, AND INCORPORATING RELIGIOUS REFERENCES, AND TERMING THE INDECENT ASSAULT AS THE "ULTIMATE ACT OF SAVAGERY."

During his pre-findings argument, trial counsel stated:

The Lieutenant was not a perfect Lieutenant. There are very few perfect lieutenants and maybe he made a mistake. Maybe it was a mistake to use nicknames. This whole business—this whole business about the FASMO talks about two phras-

es, the fuzzy-headed foreigner, and you saw Corporal Orejuela and Corporal Orejuela really wasn't very upset about the fuzzy-headed foreigner or Johnny O and dark green Marine.

Now, if the Government remembers correctly, a certain Commandant in the earlier period in the course of history when there was a great deal of racial problems, said that all Marines are all one color. They're not black, white yellow, or red; they're all green. And maybe some were a darker green than others, but they were all green. And that statement, gentlemen, is not derogatory. It's not derogatory to anybody.

So why has the accused done this three months after he couldn't come up with anything? He's done it to raise the issue of racial prejudice before this court, that's it. That's the only reason that it's been done.

Now, gentlemen, you can judge whether or not Lieutenant Lotz was racially prejudiced, but the facts do not bear that out. They simply do not. This whole thing of racial prejudice is sheer nonsense. It just isn't true, and that is using a polite term. This thing is racial for one reason, because the accused is black and the Lieutenant was white, and that's the only thing racial about this case.

Later in his sentencing argument, trial counsel stated:

He [the accused] asked for help from Lieutenant Lotz and when Lieutenant Lotz helped him, he killed him. And then when Joan Lotz came to her husband's aid, he killed her. He killed her even though, in his own words on the stand, in this courtroom, she had never done anything to him. And then he committed the ultimate act of savagery, he violated her, indecently assaulted her. And we'd ask the members to ask themselves this question: What had Joan Lotz ever done to deserve this? What had she ever done? Nothing.

Based on these arguments, the defense alleges improper argument based on racial issues, command policies, and religious preferences, as well as an inflammatory comment.

■ The defense initially raised the issue concerning race, that is, the bias of both Lotzes. Once the defense had opened the door, the argument by trial counsel became a fair comment. *See United States v. Banks,* 36 MJ 150, 162 (CMA 1992).

### ISSUE XLIX

WHETHER ARTICLE 118(1)'S MANDATORY MINIMUM LIFE SENTENCE IS UNCONSTITUTIONAL AS CRUEL AND UNUSUAL PUNISHMENT.

■ The Supreme Court has rejected this argument by stating in *Harmelin v. Michigan,* 501 U.S. 957, 994–95, 111 S.Ct. 2680, 2701, 115 L.Ed.2d 836 (1991):

Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history.... There can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is "mandatory."

### ISSUE L

WHETHER, WHERE THE BURGLARY WAS COMPLETE PRIOR TO COMMISSION OF THE HOMICIDES, THERE WAS NOT A MURDER WHILE THE ACCUSED WAS "ENGAGED IN THE COMMISSION OF A BURGLARY."

■ The crux of this issue centers around the version of RCM 1004(c)(7)(B), Manual, *supra* (1994 ed.), applicable at trial, which provided as follows:

(7) That, only in the case of a violation of Article 118(1):

* * *

(B) The murder was committed while the accused was engaged in the commission or attempted commission of any robbery, rape, aggravated arson, sod-

omy, burglary, kidnapping, mutiny, sedition, or piracy of an aircraft or vessel, or was engaged in flight or attempted flight after the commission or attempted commission of any such offense.

The defense argument assumes the breaking and entering were completed before the murders of LT Lotz and his wife. This overlooks the plain meaning of the language set forth in the rule. Such a reading would lead to an absurd result requiring the felony and murders to occur simultaneously. While the Manual does not further explain the phrase "engaged in the commission of" beyond the immediate text, there is ample explanation in the Uniform Code of Military Justice and case law.

Article 118(4) requires, as an essential element, "[t]hat, at the time of the killing, the accused was engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson." [13] See ¶ 43b(4)(d), Part IV. This phrase is further defined, in that, "[t]he commission or attempted commission of any of the offenses listed in Article 118(4) is likely to result in homicide, and when an unlawful killing occurs as a consequence of the perpetration or attempted perpetration of one of these offenses, the killing is murder." ¶ 43c(5)(a). "All that is required [to establish felony murder] is the establishment of a causal connection between the crime and the death." *United States v. Borner,* 3 USCMA 306, 312, 12 CMR 62, 68 (1953).

This proposition has been adopted by other courts. In *Stewart v. State,* 686 S.W.2d 118, 123–24 (Tex.Crim.App.1984), *cert. denied,* 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985), the Texas court affirmed Stewart's conviction of murder committed in the course of a burglary where the evidence established that the accused unlawfully entered the home of his victim, committed larceny,

attempted to commit an indecent assault or rape, and then murdered his victim.

In *Lightbourne v. Dugger,* 829 F.2d 1012, 1016 (11th Cir.1987), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988), the accused was convicted of premeditated murder and felony murder in the perpetration of burglary and sexual battery. The Eleventh Circuit affirmed the conviction where the evidence showed that the accused had broken into his victim's house, sexually assaulted her, and then murdered her.

In these cases, the felonies which formed the basis for the felony-murder conviction occurred after the burglary, that is, after the unlawful breaking and entering had occurred.

We hold that there was a causal connection between appellant's commission of the burglary offense and the premeditated murders he committed only moments later.

## ISSUE LI

WHETHER THE REQUIREMENTS OF RCM 1004(C)(7)(B) WERE NOT SATISFIED INASMUCH AS THE ABSENCE OF A BREAKING NEGATED ANY BURGLARY.

The elements of burglary under Article 129 are as follows:

(1) That the accused unlawfully broke and entered the dwelling house of another;

(2) That both the breaking and entering were done in the nighttime; and

(3) That the breaking and entering were done with the intent to commit an offense punishable under Article 118 through 128, except Article 123a.

¶ 55b, Part IV.

The premise of this issue is that no constructive breaking [14] occurred. Para. 55c(2) defines breaking:

13. *See Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

14. *See* para. 208, Manual for Courts-Martial, United States, 1951 at 373–74; Clark & Marshall, *A Treatise on the Law of Crimes* 996–97 (7th ed.1967); R. Perkins and R. Boyce, *Criminal Law* 248–49 (3d ed.1982).

There must be a breaking, actual or constructive.... There is a constructive breaking when the entry is gained by a trick, such as concealing oneself in a box; under false pretense, such as impersonating a gas or telephone inspector; by intimidating the occupants through violence or threats into opening the door; through collusion with a confederate, an occupant of the house; or by descending a chimney, even if only a partial descent is made and no room is entered.

We conclude that the Government more than proved beyond a reasonable doubt that appellant committed a "breaking" into his victims' dwelling house through false pretense. The facts and circumstances surrounding appellant's entry into the Lotz' home completely contradict appellant's argument that LT Lotz would have let him in regardless of the reason given.

■ Thus, we hold that there was a constructive breaking into the Lotz' home by means of false pretenses, so appellant was engaged in commission of the burglary at the time of the murders. *See also* Issue L.

### ISSUE LII

WHETHER THE DEATH PENALTY SENTENCING STANDARD REQUIRING AGGRAVATING FACTORS TO "SUBSTANTIALLY OUTWEIGH" EXTENUATING AND MITIGATING CIRCUMSTANCES IS UNCONSTITUTIONAL; THE ONLY ACCEPTABLE STANDARD MUST BE "BEYOND A REASONABLE DOUBT."

This issue was resolved against appellant in *United States v. Loving*, 41 MJ at 278–79, 291.

### ISSUE LIII

WHETHER THE MILITARY JUDGE COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE MEMBERS ON SENTENCING AS TO THE MEANING OF THE TERM "SUBSTANTIALLY OUTWEIGHED," WITH RE-GARD TO THE RELATIONSHIP OF MITIGATING CIRCUMSTANCES TO AGGRAVATING FACTORS.

This issue was resolved against appellant in *United States v. Loving*, 41 MJ at 291.

### ISSUE LIV

WHETHER THE FINDINGS MUST STATE EXPLICITLY THAT ALL MEMBERS CONCUR THAT ANY EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING FACTORS FOUND BY THE MEMBERS.

■ RCM 1004(b)(8) specifically states: "If death is adjudged, the president shall ... announce which aggravating factors under subsection (c) of this rule were found by the members." There is no requirement that there should also be an announcement "that all members concur that any extenuating or mitigating circumstances are substantially outweighed by the aggravating factors found by the members." It would be advisable, however, to do so.

We resolve this issue against appellant. *Cf. United States v. Loving*, 41 MJ 213, 276–79, 291.

### ISSUE LV

WHETHER THE MILITARY JUDGE'S INSTRUCTION THAT "YOU MAY NOT ADJUDGE A SENTENCE OF DEATH UNLESS YOU FIND THAT ANY AND ALL EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY ANY AGGRAVATING FACTORS ..." [R. 823] DID NOT SUFFICIENTLY INFORM THE MEMBERS THAT THIS FINDING MUST BE UNANIMOUS.

■ There was no explicit instruction in this case that the finding "that any and all extenuating or mitigating circumstances are substantially outweighed by any aggravating factors" must be unanimous. It would have been advisable to give such an instruction.

Nevertheless, we think it is clear from the instructions as a whole that the members knew that the finding had to be unanimous.

The members were told they "may not adjudge a sentence of death" without making such a finding. (R. 823.) They were also told several times (R. 819, 825, 827) that "[a] sentence of death may be adjudged only upon the unanimous vote of all the members." (R. 824). There was no request for additional instructions and no objection to the instructions given. Accordingly, this issue is without merit. *Cf. United States v. Loving,* 41 MJ at 276–79.

## ISSUE LVI

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO EXPLICITLY INSTRUCT THAT EVEN IF THE MEMBERS UNANIMOUSLY FOUND ONE OR MORE AGGRAVATING FACTORS AND EVEN IF THE MEMBERS UNANIMOUSLY DETERMINED THAT THE EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING FACTORS, EACH MEMBER STILL HAD THE ABSOLUTE DISCRETION TO DECLINE TO IMPOSE THE DEATH SENTENCE.

This issue was resolved against appellant in *United States v. Loving,* 41 MJ at 276–77.

## ISSUE LVII

WHETHER THE MILITARY JUDGE FAILED TO SPECIFICALLY ADVISE THE MEMBERS THAT ONLY A SINGLE VOTE WAS NEEDED TO DEFLECT THE DEATH SENTENCE AND COMPOUNDED THE PREJUDICE OF THIS OMISSION BY, IN FACT, ADVISING THE MEMBERS THAT APPELLANT COULD ONLY RECEIVE A LIFE SENTENCE IF SEVEN OF THE NINE MEMBERS VOTED FOR LIFE IMPRISONMENT.

▮▮▮ The issue here is whether the members understood the judge's instructions.

Three times they were instructed that death could only be imposed by a "unanimous vote of all the members." R. 824, 825, 827. They were also instructed that "a sentence which includes confinement for life requires the concurrence of three-fourths of the members, that is, seven of the nine members now present." R. 827. The members were never told that failure of three-quarters to vote for a life sentence resulted in a death sentence.

We hold that the instructions taken in context were not confusing. *United States v. Hanley,* 974 F.2d 14, 17–19 (4th Cir.1992).

## ISSUE LVIII

WHETHER, SINCE THE MILITARY IS A WEIGHING JURISDICTION, WHERE THE FELONY IS BURGLARY WITH INTENT TO COMMIT MURDER, THE USE OF A FELONY–MURDER AGGRAVATING FACTOR WHICH DUPLICATES THE UNDERLYING CAPITAL OFFENSE AND WHICH DUPLICATES ANOTHER AGGRAVATOR DOES NOT SUFFICIENTLY LIMIT THE CLASS OF PERSONS SUBJECT TO THE DEATH PENALTY NOR DOES IT PROPERLY CHANNEL THE DISCRETION OF THE SENTENCER.

## ISSUE LIX

WHETHER APPELLANT'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE CONVENING AUTHORITY ARBITRARILY CHARGED APPELLANT WITH PREMEDITATED MURDER RATHER THAN FELONY MURDER TO ALLOW THE USE OF THE BURGLARY AS AN AGGRAVATING FACTOR. *See Tennessee v. Middlebrooks,* 840 S.W.2d 317 (Tenn., 1992), *cert. granted,* 507 U.S. 1028, 113 S.Ct. 1840, 123 L.Ed.2d 466 (1993), *cert. dismissed as improvidently granted,* 510 U.S. 124, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993).

## ISSUE LX

WHETHER, AS TO THE PREJUDICE CAUSED BY THE DOUBLE–COUNTING OF AGGRAVATING FACTORS (2) and (3), THE LOWER COURT SHOULD HAVE DECLINED TO APPLY EITHER A REWEIGHING TEST OR HARMLESS–ERROR ANALYSIS INASMUCH AS EITHER PROCEDURE WAS "EXTREMELY SPECULATIVE" AND "IMPOSSIBLE" BECAUSE APPELLANT WAS DEPRIVED OF A FAIR AND RELIABLE SENTENCING PROCEEDING DUE TO THE INEFFECTIVENESS OF HIS TRIAL DEFENSE TEAM.

## ISSUE LXI

WHETHER, WHERE THE GOVERNMENT IMPERMISSIBLY DIVIDES AN AGGRAVATING FACTOR, IT IS NOT HARMLESS BEYOND A REASONABLE DOUBT WHEN MEMBERS IMPOSE A DEATH SENTENCE BASED UPON THREE RATHER THAN TWO AGGRAVATING FACTORS.

██ These four issues are concerned with double counting. The purpose of death-penalty jurisprudence is to ensure that the death penalty does not apply to every murder case but only to a subclass of defendants convicted of extraordinary murder. Issues LVIII and LIX state that neither the court members nor the convening authority can use felony murder as an aggravating factor; Issue LX infers that the court below erred in applying harmless error concerning one of the three aggravating circumstances; and Issue LXI states that there is an impermissible division of aggravating factors. In *United States v. Curtis (II)*, 33 MJ at 108, this Court noted:

[T]hree "aggravating factors" were found by the members [in this case]. In substance they were:

1) "the premeditated murder of" Mrs. Lotz "was committed while [Curtis] was engaged in the commission of a burglary";

2) "with regard to the premeditated murder of" Mrs. Lotz, Curtis "had been found

guilty in the same case of another murder"—that of Lieutenant Lotz; and

3) "with regard to the premeditated murder of" Lieutenant Lotz, Curtis had "been found guilty in the same case of another murder"—that of Mrs. Lotz.

In *Curtis II*, "we doubt[ed] that the President intended for commission of a double murder to constitute two 'aggravating factors,' rather than only one." Thus the case was remanded to the Court of Military Review to determine the effect on the sentence. 33 MJ at 108.

In this case the Court of Military Review found "that there was a double counting" and "set aside the third aggravating factor" but concluded that this error "was harmless beyond a reasonable doubt." 38 MJ at 533, 535.

The Supreme Court has acknowledged that death penalties may be upheld by allowing a "reweighing" of aggravating factors to take place on appeal. *Stringer v. Black*, 503 U.S. 222, 237, 112 S.Ct. 1130, 1140, 117 L.Ed.2d 367 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 741, 110 S.Ct. 1441, 1444, 108 L.Ed.2d 725 (1990).

In *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the Supreme Court upheld a death penalty under a statute which allowed the sentencing authority to consider one of the elements of the offense as an aggravating factor. The single aggravating factor found by the jury and upheld by the Supreme Court was that the defendant "knowingly created a risk of death or great bodily harm to more than one person." *Id.* at 243, 108 S.Ct. at 554.

██ We hold that the Court of Military Review did not err in reweighing the aggravating factors and mitigating circumstances to find the error to be harmless beyond a reasonable doubt.

## ISSUE LXII

WHETHER TRIAL COUNSEL'S FAILURE TO GIVE THE DEFENSE TIMELY NOTICE OF THEIR INTENT TO

ALLEGE EACH MURDER AS AN AGGRAVATING FACTOR FOR THE OTHER MURDER MISLED AND PREJUDICED THE DEFENSE.

## ISSUE LXIII

WHETHER THE GOVERNMENT FAILED TO PROVIDE THE DEFENSE NOTICE OF AN AGGRAVATING FACTOR AS REQUIRED BY RCM 1004(B)(1) WHEN TRIAL COUNSEL *IMPLICITLY* PRESENTED TO THE MEMBERS THE RCM 1004(C)(7)(G) AGGRAVATING FACTOR THAT LIEUTENANT LOTZ WAS A COMMISSIONED OFFICER MURDERED IN THE EXECUTION OF HIS OFFICE AND WHEN TRIAL COUNSEL *EXPLICITLY* ARGUED THAT EVERY MARINE OFFICER IS TAUGHT THAT HE SHOULD TAKE CARE OF HIS TROOPS AND THAT LIEUTENANT LOTZ DIED IN THE EXECUTION OF THAT DUTY.

The essence of this issue is that there was an improper argument by the prosecutor, as follows:

And, gentlemen, this accused used one of the lowest tricks possible to accomplish the killing of Lieutenant Lotz and his wife. He went to their door and asked for help, and the Government would consider that to be despicable. He asked for help from Lieutenant Lotz, and when Lieutenant Lotz helped him, he killed him....

\* \* \*

And then, gentlemen, I want you to ask yourselves the question: Why did First Lieutenant James F. Lotz die? Well, it's obvious in this court that the accused killed him, but why? And I submit to you, gentlemen, because First Lieutenant James F. Lotz was a United States Marine. Because every Marine officer, staff noncommissioned officer, and noncommissioned officer is taught that he should take care of his troops. It's a tradition that the Marine Corps prides itself on. That's a basic of Marine Corps leadership. Taking care of your troops comes before your own needs, and that's what First Lieutenant James F. Lotz did.

When Lance Corporal Curtis came to the Lotz quarters in the middle of the night saying, "Red was in an accident," Lieutenant Lotz didn't hesitate. He didn't leave Lance Corporal Curtis standing outside and waiting. What did he do? He immediately tried to help him. He went to the phone and then the accused stabbed him by surprise.

So why did Lieutenant Lotz try—die? Lieutenant Lotz died because he tried to help one of his troops and he was doomed to death for it..... But Lieutenant James Frank Lotz died trying to help one of his Marines and that fact is not in dispute....

The defense contends the prosecution argued that the lieutenant was killed "in the execution of his office" and that the term "in the execution of his office" was employed as an aggravating factor without notice as required by RCM 1004(b)(1).

 We hold that the prosecution did not argue that LT Lotz was "in the execution of his office" at the time of the killing or that this was an aggravating factor. In addition the judge did not submit it as an aggravating factor. In any event, LT Lotz' position and acts prior to the crime were admissible as general-aggravation under RCM 1001(b)(4).

## ISSUE LXIV

WHETHER THE GOVERNMENT FAILED TO SERVE DEFENSE COUNSEL ON 9 JULY 1987 WITH NOTICE OF THE AGGRAVATING FACTORS AND LATER CHANGED THOSE AGGRAVATING FACTORS DURING TRIAL, PROVIDING DEFENSE WITH INSUFFICIENT TIME TO PREPARE TO CHALLENGE THE AGGRAVATING FACTORS.

On July 9, 1987, the prosecutor gave defense counsel notice of the following aggravating factors:

(1) that "the murder of Mrs. Lotz was committed while the accused was engaged in the commission of a burglary"; and

(2) that appellant had "been found guilty in the same case" of the murder of LT Lotz.

On August 5, 1987, the prosecutor presented a sentence worksheet, *see* Appendix, which had three aggravating circumstances on it, one of which the court below has held was double counting. The judge told trial defense counsel that if they could show any prejudice, he would entertain their submission. Defense counsel did not ask for a recess or a continuance.

We hold that the prosecution gave defense counsel adequate notice of the aggravating factors. If defense counsel wanted a recess or a continuance for additional time, counsel could have made such a request.

## ISSUE LXV

WHETHER DUE PROCESS IN CAPITAL CASES REQUIRES TRIAL DEFENSE COUNSEL TO FILE A SEALED STATEMENT ATTACHED TO THE RECORD WHEN COUNSEL INTENTIONALLY DECIDES NOT TO OFFER SPECIFIC SIGNIFICANT MATTERS IN MITIGATION DETAILING THE REASONS FOR THE DECISION AND THE CLIENT'S EXPRESS CONSENT TO THE OMISSION OF THESE MATERIALS.

While no authority is cited for this assertion, the defense argues that this is like requesting a punitive discharge. *See also* Issue XLV.

■ Based upon our discussion of Issue I, we reject the invitation of counsel to require a sealed statement attached to the record concerning the reason for failure to include specific significant matters in mitigation.

## ISSUE LXVI

WHETHER RCM 1004 IS UNCONSTITUTIONAL UNDER THE FIFTH AND EIGHTH AMENDMENTS AND VIOLATES ARTICLE 55, UCMJ, BY NOT REQUIRING THAT SENTENCING PROCEDURES BE MORE DETAILED AND SPECIFIC TO ALLOW A RATIONAL UNDERSTANDING BY THE MILITARY JUDGE AND CONVENING AUTHORITY AS TO THE STANDARDS USED BY THE SENTENCING AUTHORITY.

■ This issue concerns the absence of any statement of mitigating factors on the sentence worksheet. Final Brief at 471. The defense was given an opportunity to comment on the sentencing worksheet and had no objections. R. 809. We hold that there is no error in the worksheet.

## ISSUE LXVII

WHETHER THE CONVENING AUTHORITY'S ACTION WAS IMPROPER INASMUCH AS THE STAFF JUDGE ADVOCATE [(SJA)] DID NOT PROPERLY COMMENT ON THE ACCUSED'S SANITY AND "SUICIDAL" STATE RAISED BY MRS. CURTIS' LETTER AND HER OFFER TO SUBMIT PSYCHIATRIC PAPERS AND ON DEFENSE COUNSEL'S CLEMENCY PETITION THAT ADDRESSED RACIAL HARASSMENT, APPELLANT'S INTOXICATION, AND EXEMPLARY LAW–ABIDING LIFE.

RCM 1106(d) envisions that the SJA recommendation will be brief. It provides in part:

(2) *Form.* The recommendation of the staff judge advocate or legal officer shall be a concise written communication.

(3) *Required contents.* Except as provided in subsection (e) of this rule, the recommendation of the staff judge advocate or legal officer shall include concise information as to:

(A) The findings and sentence adjudged by the court-martial;

(B) A summary of the accused's service record, to include length and character of service, awards and decorations

received, and any records of nonjudicial punishment and previous convictions;

(C) A statement of the nature and duration of any pretrial restraint;

(D) If there is a pretrial agreement, a statement of any action the convening authority is obligated to take under the agreement or a statement of the reasons why the convening authority is not obligated to take specific action under the agreement; and

(E) A specific recommendation as to the action to be taken by the convening authority on the sentence.

 The SJA recommendation did contain optional matters. It listed the detailed clemency letter from appellant and asked that it be considered. ¶ j. The convening authority's action states: "I have specifically considered the matters submitted pursuant to RCM 1105, MCM, 1984, prior to taking action in this case." It also states: "There are no other facts which tend to extenuate, mitigate, or aggravate the offenses that do not appear in the record of trial." The defense appears to argue that since the clemency petition contains significant mitigating evidence, the SJA should have commented on that evidence to the convening authority. However, the only requirement upon the SJA is to comment upon legal errors. RCM 1106(d)(4).

The Government invokes waiver and argues that all the clemency matters were submitted to the convening authority for approving the sentence and that he considered them. Answer to Final Brief at 292.

We hold that there was no error because the SJA is not required to summarize clemency matters in the post-trial recommendation. RCM 1105 and 1106(d)(3).

## ISSUE LXVIII

WHETHER ARTICLE 142(b)(2)'S LIMITATION OF COURT OF MILITARY APPEALS JUDGES TO TERMS OF OFFICE OF FIFTEEN YEARS VIOLATES ARTICLE III, SECTION 1, U.S. CONSTITUTION, WHICH GUARANTEES LIFE TERM OF OFFICE TO JUDGES OF INFERIOR COURTS AS THE CONGRESS MAY ESTABLISH.

## ISSUE LXIX

WHETHER THE JUDGE ADVOCATE GENERAL OF THE NAVY'S PREPARATION OF THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW JUDGES' FITNESS REPORTS DEPRIVES THAT COURT OF ITS INDEPENDENCE AND THE APPEARANCE OF INDEPENDENCE.

These issues were resolved against appellant in *Weiss v. United States,* 510 U.S. at 176–77, 114 S.Ct. at 760, and *United States v. Mitchell,* 39 MJ 131(CMA), *cert. denied,* —— U.S. ——, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994).

## ISSUE LXX

WHETHER THE COURT OF MILITARY REVIEW ERRED IN FAILING TO INQUIRE AS TO THE IDENTITY AND PRACTICE OF THE AUTHORITY WHO DETAILED APPELLATE DEFENSE COUNSEL AND IN FAILING TO ENSURE THAT COUNSEL WERE QUALIFIED IN TRAINING, EXPERIENCE, AND EDUCATION TO DEFEND A CAPITAL CASE.

 To ensure effective assistance of appellate counsel, we have applied the standard of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), on appeal. *United States v. Quigley,* 35 MJ 345, 348 (CMA 1992). Thus, we hold that there is no separate duty upon the Court of Military Review to inquire as to the experience of detailed appellate defense counsel.

## ISSUE LXXI

WHETHER A FACTFINDING COURT OF MILITARY REVIEW MUST *UNANIMOUSLY* AGREE ON BOTH FINDINGS OF GUILT AND THE SENTENCE IN A CAPITAL CASE AND

MUST APPLY A POLICY OF *IN FAVO-REM VITAE*.

To support arguments concerning this issue, the defense has cited the dissenting opinion of Justice Stevens in *Smith v. Murray*, 477 U.S. 527, 548 and n. 20, 106 S.Ct. 2661, 2673–74 and n. 20, 91 L.Ed.2d 434 (1986), and the dissenting opinion of Judge Mollison in this case, 38 MJ at 545. Final Brief at 474–75. The purpose of death-penalty jurisprudence is to ensure that the death penalty does not apply to every murder case but only to a subclass of defendants convicted of extraordinary murder. As discussed in Issues LXXIII to LXXVI, the procedures in place certainly satisfy that purpose. Additionally, the Supreme Court has rejected the *in favorem vitae* (in favor of life) approach to appellate review of capital cases. *Smith v. Murray*, 477 U.S. at 533–39, 106 S.Ct. at 2665–69.

■ In the absence of a Constitutional, Codal, or Manual provision, we hold that the intermediate appellate court is not required to agree unanimously in order to affirm both findings and sentence in a capital case.

## ISSUE LXXII

WHETHER THE NUMEROUS ERRORS WHICH OCCURRED DURING THE SENTENCING PHASE OF APPELLANT'S COURT–MARTIAL CANNOT BE FOUND HARMLESS BEYOND A REASONABLE DOUBT WHEN CONSIDERED COLLECTIVELY.

The other allegations of error have been found to be without merit.

This issue is in effect mooted by our decision in *Loving* as to the extent of the proportionality review. *See* 41 MJ at 290–91.

## ISSUE LXXIII

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED IN THE MANNER IN WHICH IT CONDUCTED ITS MAN-DATED PROPORTIONALITY REVIEW OF APPELLANT'S CASE.

## ISSUE LXXIV

WHETHER APPELLANT WAS DENIED HIS RIGHT TO EXPERT ASSISTANCE WHEN HE WAS REFUSED FUNDING TO HIRE PROFESSOR BALDUS AS A CONSULTANT ON PROPORTIONALITY.

## ISSUE LXXV

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED IN CONCLUDING THAT APPELLANT'S CASE WAS NOT DISPROPORTIONATE.

## ISSUE LXXVI

WHETHER THE LOWER COURT ERRED IN CONCLUDING THAT THE DEATH SENTENCE WAS AN APPROPRIATE SENTENCE IN THIS CASE.

In *Curtis II*, Senior Judge Everett, writing for the majority, held that Article 66(c), UCMJ, 10 USC § 866(c), "encompasses a limited proportionality review of death sentences." 33 MJ at 109. This was reinforced by the summary disposition in *United States v. Murphy*, 36 MJ 8 (CMA 1992). *But see* 36 MJ at 9 (Crawford, J., dissenting).

■ What was left unanswered, however, was guidance on how to conduct the proportionality review, specifically the scope of the universe of cases for comparison and the mechanics of conducting such comparison. Once the universe is identified, the defense argues two additional steps are needed: first, a data base against which appellant's case will be compared; and second, the methods and means of comparison. While recognizing that the Supreme Court has rejected the necessity of any proportionality review, Final Brief at 481 (*see United States v. Curtis*, 32 MJ at 270), the defense argues that a proportionality review should include within the universe "similar crimes" having "similar fact

patterns or levels of culpability." Final Brief at 490.

This Court denied a defense motion in this case for clarification of the proportionality universe. This motion was denied without prejudice, however, with two judges stating they

> would grant the motion so that this Court, now, could consider and determine the appropriate universe of cases to examine in conducting a proportionality review. Instead, with the Court's denial of the motion without prejudice, it is left for the Court of Military Review to make the determination at this point—a determination that, presumably, this Court will be asked to review in due course in any event.

37 MJ 43 (1992).

The defense notes that while "the State of New Jersey ... declined to determine the universe ... [t]he State Supreme Court used Professor Baldus, the Joseph B. Tye Professor of Law at the University of Iowa College of Law, *as a neutral party* to produce a data base" to form the basis of the proportionality review. Final Brief at 493 (footnote omitted):

> The universe considered by the court below included

> the following cases: (1) Post-*Furman* cases reviewed by the U.S. Supreme Court in which state courts have imposed the death penalty; (2) all military cases tried after August 1, 1984, and reviewed by the appropriate court of military review, in which the trial court imposed the death penalty; and (3) all capital cases in the naval service tried after August 1, 1984, and reviewed by this Court in which the accused was death-eligible at the time of sentencing, irrespective of whether the accused was sentenced to death or life.

> We specifically reject the position that we should compare all cases in which a defendant committed an offense which would potentially be referred capital, cases where discretion was exercised at some point in the proceeding which removed death as a possible sentence, cases in

which a finding of some offense less than premeditated or felony murder was reached, and *all* cases where a life sentence instead of death was adjudged.

38 MJ at 543 (footnote omitted).

This review goes beyond the Court of Military Review's proportionality review approved in *Loving.* 41 MJ at 290–91. There we held that review of "five cases involving murder for pecuniary gain" decided by the Supreme Court was a sufficient proportionality review. *Id.* at 290. Since the universe in this case extends far beyond that, we uphold the review conducted by the court below.

## CONCLUSION

The essence of capital litigation is to place limitations on the type of offense that is death qualifying. That was done by Congress. Another essential part of capital litigation is to ensure that the death-qualifying offenses are further limited by aggravating factors and that the procedures employed ensure that these factors are not applied in an arbitrary or discriminatory fashion. Pursuant to rulemaking authority under Article 36, UCMJ, 10 USC § 836, the President has required very extensive procedures to make sure there is no arbitrary imposition of the death penalty in the military. *See Loving v. United States,* —— U.S. ——, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). Additional protections are built into the RCM 1000 rules:

a. RCM 1004(a)(2) requires a unanimous vote for a conviction of the death-authorized offense.

b. Ordinarily, before arraignment, the prosecutor must "give the defense written notice" of the applicable aggravating factors listed in RCM 1004(c). RCM 1004(b)(1).

c. During the sentencing procedure, the prosecutor may present evidence as to one or more aggravating factors and the "accused shall be given broad latitude to present evidence in extenuation and mitigation." RCM 1004(b)(2) and (3).

d. RCM 1004(b)(4) and (c) require that the members unanimously find beyond a rea-

sonable doubt an aggravating factor and that that factor substantially outweighs any extenuation or mitigation. There is no constitutional requirement for the substantially-outweigh provision, *Boyde v. California,* 494 U.S. 370, 377, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990), or a requirement that the finding be beyond a reasonable doubt, *Walton v. Arizona,* 497 U.S. 639, 649–50, 110 S.Ct. 3047, 3054–55, 111 L.Ed.2d 511 (1990)(plurality opinion). In *Walton* the Supreme Court held that the burden could be placed on the defendant to prove "the existence of mitigating circumstances" by a preponderance of the evidence.

e. A vote on the proposed sentence that includes death may not occur until the members, by secret written ballot, vote "separately on each aggravating factor" which they have been instructed on and unless they unanimously agree beyond a reasonable doubt that a particular factor exists in the case. RCM 1004(b)(7).

f. In *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), the Court upheld as constitutionally permissible a procedure that requires the jury to impose the death sentence if it finds at least one listed aggravating circumstance and no mitigating circumstances. The military justice system has no instruction as to a mandatory death sentence except as to Article 106, UCMJ, 10 USC § 906.

g. The military justice system does not allow the judge to overrule the sentence imposed by the jurors. Yet the Supreme Court has upheld such an overruling procedure in *Hildwin v. Florida,* 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989).

h. The military justice system also requires a proportionality review, even though not constitutionally required. *Walton v. Arizona,* 497 U.S. at 655, 110 S.Ct. at 3058; *United States v. Curtis,* 33 MJ at 108–09.

After reviewing the record of this trial, the overwhelming evidence surrounding the commission of these crimes, and the additional procedural protections considered as a whole, we conclude that Lance Corporal Ronnie A. Curtis received a fair trial free from any prejudicial errors affecting his substantial rights. Under the circumstances of this case, it is difficult to imagine a jury that would not have imposed a penalty of death.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge COX concurs.

Judge WISS sat for oral argument but did not vote on this opinion.

**168**

# APPENDIX

### SENTENCE WORKSHEET

#### UNITED STATES

#### V

#### LANCE CORPORAL RONNIE A. CURTIS, U.S. MARINE CORPS

(If the court adjudges a death sentence, the President shall indicate which aggravating factors have been proven, and strike out any not proven. If a death sentence is not adjudged, the aggravating factors portion of this document should be nullified by marking a large "X" across it.)

#### AGGRAVATING FACTORS

"Lance Corporal Ronnie A. CURTIS, U.S. Marine Corps, this court-martial finds that the following aggravating factor(s) have been proven beyond a reasonable doubt:

| Found by Unanimous Vote | Not Found by Unanimous Vote | |
|---|---|---|
| 1. _Yes_ | _____ | That with regard to the premeditated murder of Mrs. Joan M. LOTZ, the premeditated murder of her was committed while the accused, Lance Corporal Ronnie A. CURTIS, U.S. Marine Corps, was engaged in the commission of a burglary; |
| 2. _Yes_ | _____ | That with regard to the premeditated murder of Mrs. Joan M. LOTZ, that the accused, Lance Corporal Ronnie A. CURTIS, has been found guilty in the same case of another murder, to wit: that of Lieutenant James F. LOTZ, U.S. Marine Corps Reserve, in violation of Article 118, Uniform Code of Military Justice; and |
| 3. _Yes_ | _____ | That with regard to the premeditated murder of Lieutenant James F. LOTZ, U.S. Marine Corps Reserve, the accused, Lance Corporal Ronnie A. CURTIS, U.S. Marine Corps, has been found guilty in the same case of another murder, to wit: that of Mrs. Joan M. LOTZ, in violation of Article 118, Uniform Code of Military Justice. |

AE LX

SENTENCE

(After the court has reached a sentence, the President shall circle the punishment(s) selected and accomplish any necessary filling in or crossing out within the punishment(s) selected.)

Lance Corporal Ronnie A. CURTIS, U.S. Marine Corps, this court-martial sentences you:

~~REPRIMAND~~

~~1. To be reprimand~~ed.

~~REDUCTION OF ENLISTED PERSONNEL~~

~~2. To be reduced to the grade of~~ _____ .

~~FORFEITURES, FINE~~

~~3. To forfeit $ _____ pay per month for ____ [month(s)] [years]~~ .

~~4. To forfeit all pay and allowances~~ .

~~5. To pay the United States a fine of $ _____~~ .

~~CONFINEMENT~~

~~6. To be confined for the length of your natural life~~ .

~~PUNITIVE DISCHARGE~~

~~7. To be discharged from the service with a bad conduct discharge~~ .

~~8. To be dishonorably discharged from the service~~ .

DEATH

9. By unanimous vote of all the members present, to be put to death.

---

SULLIVAN, Judge (concurring):

I join the principal opinion in finding no legal error in this capital case. Art. 67, Uniform Code of Military Justice, 10 USC § 867.

Appellant's deficient-performance-of-counsel argument is based on the failure of his lawyers to uncover evidence of his alleged physical and emotional abuse as a child. In view of his own role in concealing this information and his counsel's interview of family members, such an argument has no legal merit. *See Lambrix v. Singletary,* 72 F.3d 1500, 1505–06 (11th Cir.1996); *Barnes v. Thompson,* 58 F.3d 971, 979–80 (4th Cir.) (defense counsel can "rely on the truthfulness of his client" and the persons "he interviews in deciding how to pursue his investigation"), *cert. denied,* —— U.S. ——, 116 S.Ct. 435, 133 L.Ed.2d 350 (1995). Moreover, I am not persuaded that failure to present this evidence to the members prejudiced appellant in the sense intended by *Strickland v. Washington,* 466 U.S. 668, 699–700, 104 S.Ct. 2052, 2070–71, 80 L.Ed.2d 674 (1984). *See Marek v. Singletary,* 62 F.3d 1295, 1300–01 (11th Cir.1995) (In some cases "evidence of an abusive and difficult childhood would have been entitled to little, if any, mitigating weight."). Accordingly, I join the

principal opinion in rejecting this constitutional claim.

Another question in this case concerns me. It is whether appellant was denied his Sixth Amendment right to counsel because his defense lawyer in his sentencing argument failed to exploit appellant's voluntary intoxication on the night of these murders for the purpose of avoiding the death penalty. I agree with the principal opinion that ample evidence of this circumstance was presented to the members but its exploitation posed certain risks for the defense. In any event, I also do not believe it can be fairly said that defense counsel ignored this circumstance in his argument on sentence.

Defense counsel expressly referred to appellant's intoxication in his findings argument as follows:

> Okay, so was Lance Corporal Curtis angry when that [the killings] happened? Does anybody at this particular point in time doubt that? Well, just that emotion in and of itself in that degree is sufficient under the law to reduce premeditated murder to unpremeditated murder. But in addition to that you're going to receive another instruction on voluntary intoxication and the judge is going to tell you that voluntary intoxication and its effects upon the mind may, by itself, with nothing else, reduce premeditated murder to unpremeditated murder. So, Lance Corporal Ronnie Curtis was both in a rage and drunk out of his mind and there you have the defense theory as to Mrs. Lotz: Lance Corporal Ronnie Curtis, guilty of the unpremeditated murder of Mrs. Lotz.

Moreover, in his closing argument on sentencing, he expressly linked his plea for mercy to his earlier argument on findings, stating:

> When I first spoke with you some days ago I said that there was a third victim in this case and that victim was Lance Corporal Ronnie Curtis. I said it again in my closing argument on the findings and I'm going to say it to you again. Lance Corporal Curtis is the third victim in this case.

Defense counsel's tactical decision to emphasize appellant's positive character traits and the aberrational nature of his conduct on the night in question cannot reasonably be considered ineffective assistance of counsel. His decision to obliquely reference appellant's voluntary intoxication also cannot now be legally questioned. *See Romero v. Lynaugh,* 884 F.2d 871, 877 (5th Cir.1989) (was a tactical decision not to argue intoxication evidence already before jury), *cert. denied,* 494 U.S. 1012, 110 S.Ct. 1311, 108 L.Ed.2d 487 (1990); *see also Davis v. Executive Director of the Department of Corrections,* 891 F.Supp. 1459, 1464 (D.Col.1995). Viewing both arguments together, I see no constitutionally ineffective assistance of counsel. *See Flamer v. State of Delaware,* 68 F.3d 710, 735 (3d Cir.1995).

There is another tactical reason why defense counsel did not emphasize intoxication in this case. The facts seem to indicate that alcohol was a fuel rather than an excuse in this case. The core of an "alcohol abuse-excuse" case is impairment of a defendant's mental abilities.

Although there is evidence in the record that Curtis did some heavy drinking before the murders,[*] the fact remains that appellant had sufficient mental and physical abilities to:

1. decide to kill LT Lotz;

2. successfully break into the supply building;

3. pick a lock on the security cage and steal a Marine Corps K-bar knife (the murder weapon);

4. then go back to his barracks room to get a pair of gloves so he would not leave fingerprints;

5. successfully take a bicycle and ride at night 1.5 miles to LT Lotz' home;

6. hide the bicycle in the back of the Lotz home and conceal the K-bar knife in his waistband;

---

[*] Appellant on direct examination responded that he consumed "no more" than a pint of alcohol the night of the murders.

7. knock on the front door of the Lotz home and verbally trick a Marine officer into letting him inside his home at midnight;

8. with a knife confront and kill that Marine officer with 2 stabs;

9. fight off Mrs. Lotz and kill her with 8 stabs;

10. search the Lotz house and find car keys and money for gas;

11. steal one car from the Lotz house; and

12. return to the Lotz home and steal the other car.

With this record, it is no wonder the defense handled the intoxication defense as they did. The average military jury has the education level of at least a college graduate if the jury member is an officer, and at least a high school graduate if the member is enlisted. The military jury is hard to fool and its intelligence should not be underestimated.

With such a jury and such a record, the "alcohol abuse-excuse" may not have been the best course of action for the defense. Moreover, a smart jury would understand that a blood alcohol content of .06 at 7:00 a.m. the next morning proves nothing about the mental and physical ability of a defendant at midnight 7 hours before. Especially if the jury remembers Curtis took a canteen of gin and Mountain Dew with him on his trip to the Lotz home.

GIERKE, Judge (concurring in part and dissenting in part):

I agree with the majority's decision to affirm the findings, but I cannot join in affirming this Marine's death sentence. I am not satisfied that Lance Corporal (LCPL) Curtis received the representation during presentencing that the Constitution requires and a member of our Armed Forces deserves.

Appellant needed only one vote to avoid a death sentence. See RCM 1004(b)(4)(C) & (7), and 1006(d)(4)(A), Manual for Courts-Martial, United States (1994 ed.). I am troubled by the defense failure to present the ample—and sometimes gratuitous—intoxication evidence as a matter in extenuation. See RCM 1001(c)(1)(A) ("Matter in extenuation of an offense serves to explain the circumstances surrounding the commission of an offense, including those reasons for committing the offense which do not constitute a legal justification or excuse."). It would appear that the defense had nothing to lose after the "rage" theory of defense failed. I would remand for further factfinding to determine the tactical reasons behind the defense team's failure to incorporate the intoxication evidence into their presentencing case. United States v. Boone, 42 MJ 308, 314 (1995) (remanded for further factfinding on why such a meager sentencing case was presented).

Appellant's case was not a dispute about "Did he do it?" Quite the contrary, the focus of the case was "Why did he do it?" The defense team's job was to provide an explanation sufficient to win one vote for life.

LCPL Curtis' defense team may well have had valid tactical reasons for not exploiting the intoxication evidence, but the record does not reflect them. To the contrary, this record cries out for explanation.

LCPL Curtis' presentencing case was brief, taking only two hours and eight minutes, including recesses. The defense presented five witnesses (no experts) and two exhibits, but did not present any evidence of appellant's intoxication.

The defense sentencing argument covered less than three pages in the record and said nothing about appellant's intoxication or how it was linked to the murders. The defense did not request an instruction that intoxication was a relevant factor for the members to consider during deliberations. The members deliberated for only an hour and 18 minutes before sentencing LCPL Curtis to death.

There are countless ways to provide effective assistance in any given case. Certainly, length is not the sole yardstick to measure counsel's performance. Under the facts and circumstances of this case, however, I believe that there is a serious question whether LCPL Curtis would have been sentenced to death if counsel had used the intoxication

evidence to convince at least one member to vote for life.

The record is replete with evidence of substantial intoxication. LCPL Moore testified that Curtis was "'heavily' drunk," having consumed between half and three-quarters of a half gallon of gin. 44 MJ at 122. LCPL Moore, in a statement to law enforcement officials, observed that at about midnight "Curtis was too drunk to move." LCPL Jones, who lived next door to Curtis on the night of the killings, was also aware of his intoxication and how it affected him. LCPL Curtis himself testified that he had consumed "about a pint" of gin before the murders.

In Trooper Addison's North Carolina "Driving While Impaired Report Form HP-327," he rated Curtis as "unfit" to drive. According to the report, at 7:16 a.m. on April 14, Curtis' speech was slurred; he took an incorrect number of steps on the walk and turn test; he was swaying; and he failed the finger-to-nose test with both hands. In Trooper Addison's opinion, Curtis' impairment was extreme, the most severe category available. Likewise, the "Affidavit and Revocation Report of Charging Officer," showed that at 7:16 a.m. Curtis had a "strong odor of a alcohol [sic] beverage on his breath— Glassy eyes." There was chemical evidence available from a breathalyzer test that showed the Curtis' blood-alcohol content was still .06 some seven hours after the murders.

The defense also had a sanity board report estimating that appellant's blood-alcohol content was .20 when the murders occurred. Most importantly, the sanity board opined that "it is doubtful that the event would have happened without the use of alcohol." Inexplicably, the defense used none of this evidence.

Federal law, both military and civilian, recognizes that intoxication may mitigate an offense. See, e.g., RCM 916(l)(2), Discussion ("[E]vidence of voluntary intoxication may be admitted in extenuation."). A standard sentencing instruction in military practice is that the members may consider an accused's "physical impairment" as a matter in extenuation and mitigation. See para. 2–37, Military Judges' Benchbook at 2–45 (Dept. of the Army Pamphlet 27–9 (Change 1, Feb. 1985)). Federal law specifically recognized impairment as a statutory mitigator in the aircraft piracy and hijacking statute in effect when appellant was tried. See 49 USC § 1473(c)(6)(b) (1974). The current "drug kingpin" murder statute also includes an impairment mitigator. See 18 USC §§ 3591(b)(2) and 3592(a)(1) (1994), and 21 USC § 848(m)(1) (1988). Finally, intoxication has been recognized as a nonstatutory mitigator in capital murder cases. See Parker v. Dugger, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991).

The majority states that "[d]efense counsel had a number of options in dealing with the intoxication issue: to ignore it, deny it, or work it in to the findings and sentencing portions of the trial." The majority relies on MAJ Boyett's opinion that the appellant's intoxication was not "a significant factor." The majority also relies on the defense team's "strategic decision not to present intoxication as a key factor in the killings but, rather, to refer to it in argument." 44 MJ at 122.

Although both MAJ Boyett and CAPT Lambert were asked after the trial about their failure to exploit the intoxication evidence, their post-trial affidavits refer only to their decision not to present intoxication evidence on the merits. Neither defense counsel has explained why the defense did not exploit the intoxication evidence during the presentencing hearing.

The defense team's omissions are troublesome. The intoxication evidence was consistent with the unsuccessful "rage" defense, and thus did not require a change of tactics after findings. Once the court members rejected the "rage" theory, there was no explanation offered to the members why a previously good Marine or a shy, introverted, young man from a good Christian home would commit these offenses. The answer appears to be in the sanity board report. The intoxication evidence, as discussed in the

sanity board report, tended to show that Curtis' "use of alcohol reduced his ability to control his hostility." Significantly, the report opined that Curtis probably would not have committed the offenses if he had not consumed alcohol. Yet the defense did not attempt to use the information from the sanity board report, did not present any intoxication evidence during presentencing, did not request an instruction that intoxication is an extenuating circumstance under RCM 1001(c)(1)(a) and did not mention Curtis' intoxication in sentencing argument.

CAPT Lambert does not address this issue in his post-trial affidavit. MAJ Boyett explains his failure to exploit the sanity board report by saying that he "did not like Dr. Ogburn's comments about this being a clearly premeditated act." While I can accept his explanation for findings, he does not explain the defense team's failure to use it in presentencing, after the members had already found premeditation unanimously and beyond a reasonable doubt. I need additional explanation before I can be satisfied that LCPL Curtis received the effective assistance of counsel guaranteed to men and women of the Armed Forces by the Constitution, the Uniform Code of Military Justice, and the decisions of this Court. *See United States v. Scott,* 24 MJ 186 (CMA 1987).